GEORGE ROSADO ET AL. *v.* BRIDGEPORT ROMAN
CATHOLIC DIOCESAN CORPORATION ET AL.

GEORGE ROSADO ET AL. *v.* BRIDGEPORT ROMAN
CATHOLIC DIOCESAN CORPORATION ET AL.

J. KNECHT *v.* BRIDGEPORT ROMAN CATHOLIC
DIOCESAN CORPORATION ET AL.

IN RE APPLICATION OF THE NEW YORK TIMES
COMPANY FOR ORDER VACATING PROTEC-
TIVE ORDERS AND REQUIRING FILING
OF DISCOVERY MATERIALS
(SC 17059)
(SC 17060)

Sullivan, C. J., and Palmer, Vertefeuille, Zarella and Licari, Js.

Argued September 22, 2004—officially released November 15, 2005

*Ralph G. Elliot,* for the appellant in Docket No. SC 17059 (The Hartford Courant Company).

*Jonathan M. Albano,* pro hac vice, with whom were *James S. Rollins* and, on the brief, *Kimberly M. White,* for the appellants in Docket No. SC 17060 (The New York Times Company et al.).

*John B. Farley,* with whom were *Ralph W. Johnson III* and, on the brief, *Joseph T. Sweeney, James F. Stapleton* and *James V. Somers,* for the appellees (named defendant et al.).

*Robert G. Golger,* for the appellees (defendant Charles Carr et al.).

*John F. Conway,* with whom was *W. Glen Pierson,* for the appellees (John Doe I et al.).

*Opinion*

PALMER, J. Under General Statutes § 52-212a,[1] a civil judgment or decree may not be opened or set aside more than four months after it has been rendered unless the trial court has continuing jurisdiction over the case in which the judgment or decree has been rendered.[2] This certified appeal presents an important issue of first impression, namely, whether, under § 52-212a, a trial court has continuing jurisdiction to vacate a protective order, upon motion of a third party, pertaining to documents in the court's possession that relate to a case that has been withdrawn more than four months prior to the filing of the motion to vacate the protective order. We conclude that a trial court has continuing jurisdiction in such circumstances. Because the Appellate Court reached a contrary conclusion; see *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, 77 Conn. App. 690, 723–24, 825 A.2d 153 (2003); we reverse its judgment.

This case presents a unique, and somewhat convoluted, procedural history, beginning with the filing, in the mid-1990s, of twenty-three lawsuits alleging sexual abuse of minors by clergymen employed by the Bridgeport Roman Catholic Diocesan Corporation (Diocese).[3] In the course of pretrial discovery in those cases, all of which were pending in the Waterbury judicial district, the trial court, *Levin, J.*, issued sealing and protective

---

[1] General Statutes § 52-212a provides in relevant part: "Unless otherwise provided by law and except in such cases in which the court has continuing jurisdiction, a civil judgment or decree rendered in the Superior Court may not be opened or set aside unless a motion to open or set aside is filed within four months following the date on which it was rendered or passed. . . ."

[2] Although § 52-212a also contemplates exceptions to the four month limitation period as "provided by law"; see footnote 1 of this opinion; only the continuing jurisdiction exception is implicated in this case.

[3] The Diocese was a defendant in all of the lawsuits, along with certain clergymen employed by the Diocese.

orders[4] with respect to certain documents and information that had been obtained by counsel. During the course of the litigation of those cases, and in accordance with those orders, the parties filed with the court numerous sealed documents for review by the court in connection with its adjudication of various motions. On March 12, 2001, prior to trial, all of the lawsuits were settled and withdrawn, with prejudice.

On March 26, 2002, The New York Times Company (Times), publisher of The New York Times, filed an "emergency motion" with the clerk's office of the Superior Court in the judicial district of Waterbury seeking permission to intervene in three of those twenty-three withdrawn actions, namely, *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, Superior Court, judicial district of Waterbury, Docket No. CV-93-0157085-S, *See* v. *Bridgeport Roman Catholic Diocesan Corp.*, Superior Court, judicial district of Waterbury, Docket No. CV-93-0157363-S, and *Fleetwood* v. *Bridgeport Roman Catholic Diocesan Corp.*, Superior Court, judicial district of Waterbury, Docket No. CV-95-0156274-S. The Times also sought in its motion an "order vacating orders previously entered in [those] cases sealing judicial documents, including evidentiary materials submitted in connection with summary judgment motions and other matters ruled upon by the court . . . ."[5] The motion stated that the Times also was "seeking leave to

[4] We hereinafter refer to these sealing and protective orders as "protective orders."

[5] In its motion, the Times also requested: (1) "an order vacating protective orders that restrict public access to pretrial discovery materials"; and (2) "an order requiring the filing of all depositions, answers to interrogatories and responses to requests for admission and document requests" in order "to ensure that all members of the public have an equal opportunity to review the complete record of these proceedings . . . ." Under our rules of practice, parties exchange discovery materials among themselves; generally, there is no requirement that discovery materials be filed with the court. See generally Practice Book § 13-1 et seq.

file a consolidated omnibus motion requesting identical relief in the . . . twenty other sex abuse cases to which the [Diocese] is a party."[6]

Among the protective orders that the Times sought to have vacated were those that had been issued in the *Rosado* case on December 8, 1994, and in the *Fleetwood* case on October 23, 1997. Those protective orders, which were identical, provided, inter alia, that information and materials obtained by the parties through the depositions of the defendants[7] and certain other persons were not to be disclosed or disseminated to nonparties "[u]ntil further order of the court, which order shall be made not later than the completion of jury selection . . . ."[8] The orders further provided that any document filed with the court containing information covered by those orders was to be filed under seal.[9]

[6] The Times' motion was predicated on information that the Times had obtained concerning the existence of certain documents that were in the possession of the court and that had been filed under seal in the withdrawn cases. Although the motion and its accompanying memorandum of law do not explain why the motion was filed on an emergency basis, "[t]he motion was [likely] described as an 'emergency motion' because the files in the settled cases were subject to destruction on March 12, 2002, pursuant to Practice Book § 7-10." *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, 77 Conn. App. 694 n.4.

Practice Book § 7-10 provides in relevant part: "The files in all civil . . . actions . . . which, before a final judgment has been rendered on the issues, have been terminated by the filing of a withdrawal . . . may be destroyed upon the expiration of one year after such termination . . . ."

[7] In this context, the "defendants" include the Diocese and the other defendants who were named or joined, or who intervened, in the twenty-three lawsuits.

[8] The memorandum of law that the Times filed in support of its March 26, 2002 motion contains a footnote stating that "[t]he Times is informed and believes that a similar, if not identical, protective order" had been entered in the *See* case.

[9] The orders provided: "1. Until further order of the court, which order shall be made not later than the completion of jury selection, all information, documents and transcripts which the parties may obtain through the depositions of the defendants, including persons designated pursuant to [what is now Practice Book § 13-27 (h)], and Bishop Edward Egan, shall not be disseminated, shown, disclosed, divulged or transmitted by any one to any

The trial court, *McWeeny, J.*,[10] scheduled a hearing on the Times' motion for April 24, 2002. Prior to that hearing, however, on April 18, 2002, the Times filed an application with the Superior Court in the judicial district of Waterbury providing, inter alia, that, "[p]ursuant to the request of the office of the clerk of court for the judicial district of Waterbury . . . [the Times] respectfully applies to the court to open a separate case file for the maintenance of court filings related to the Times' motion dated March 26, 2002 . . . previously filed in [the *Rosado, See* and *Fleetwood* cases] . . . ." The Times explained that it was requesting the court to open a new file in light of the Times' understanding that the "court intends that future filings related to the [Times' March 26, 2002] motion, or to similar matters in the [twenty-three withdrawn cases], be directed to this newly created case file to facilitate the court's administrative handling of these matters."

person or organization other than the parties to this lawsuit and their respective attorneys, and to any investigators and potential expert witnesses retained by the parties to this lawsuit or their attorneys and stenographic personnel with a need and obligation to see and receive the same, PROVIDED, that no such information or document shall be disseminated, shown, disclosed, divulged or transmitted to any person whatsoever, other than to the parties and their attorneys, unless and until such other person first is shown a copy of this protective order, reads it, agrees to be bound by its terms and to the terms of any order supplementing this order, and signifies his or her agreement by signing both pages of this order.

"2. All such documents and transcripts which the attorneys representing any of the parties believe in good faith may be entitled to protection from disclosure after the completion of jury selection, shall be marked 'CONFIDENTIAL: SUBJECT TO COURT ORDER' and shall be submitted to the court for review and appropriate order before being released from the protection afforded by this order.

"3. Whenever any pleading, document or motion referencing, incorporating or attaching any documents described in paragraph one of this order is filed with the court or delivered to any judge thereof, it shall be filed or delivered under seal pending review by the court or judge and shall be marked by the party filing or delivering same 'CONFIDENTIAL: SUBJECT TO COURT ORDER.' "

[10] Hereinafter, all references to the trial court are to the court, *McWeeny, J.*, unless otherwise indicated.

On April 22, 2002, The Hartford Courant Company (Courant), publisher of The Hartford Courant, filed a motion to intervene in the *Rosado, See* and *Fleetwood* cases. The motion indicated that the Courant sought to join the Times' motion for the purpose of raising the same claims that the Times had raised in its March 26, 2002 motion.

On April 23, 2002, the Diocese filed objections to the Times' March 26, 2002 motion and to the Times' April 18, 2002 application to open a new file. In its objection to the Times' motion, the Diocese stated that it also was objecting "on behalf of all individual defendants" for whom two specified law firms had appeared in the twenty-three lawsuits including the *Rosado, Fleetwood* and *See* cases. With regard to the Times' motion, the Diocese maintained, inter alia, that the court lacked jurisdiction to adjudicate the Times' claim that the protective orders should be vacated because the Times had not filed the motion within the four month limitation period enumerated in § 52-212a.[11] With respect to the Times' application to open a new case file, the Diocese asserted that: "(1) the court no longer has jurisdiction over [the withdrawn] actions . . . and thus cannot undertake any further proceedings in them; (2) the Times has not been and should not be granted intervenor status in [the withdrawn] actions . . . and thus is not entitled to any substantive or procedural relief of any sort; and (3) granting the Times' application could arguably impair the Diocese's rights to object to the Times' motion based [on] the issues of jurisdiction

---

[11] As this court has explained, "§ 52-212a operates as a constraint, not on the trial court's jurisdictional authority, but on its substantive authority to adjudicate the merits of the case before it." *Kim* v. *Magnotta*, 249 Conn. 94, 104, 733 A.2d 809 (1999). Although the parties and the trial court have characterized the four month limitation period of § 52-212a in jurisdictional terms, those references pertain to the limitation that § 52-212a places on the court's power or authority to adjudicate the merits of the claim presented.

and intervention."[12] In summarizing its objection to the Times' application, the Diocese asserted that the court "should not take a case that was withdrawn long ago, breathe new life into it, and convert it into a separate, new case that might appear to eliminate jurisdictional barriers and hurdles to intervention."

On April 24, 2002, the trial court held a hearing to address both the Times' March 26, 2002 motion and its application to open a new file. At the outset of the hearing, the court announced that, because the twenty-three cases had been withdrawn more than one year earlier, it would docket both the motion and the application in a new file. The court assured the parties, however, that, in opening the new file, it was "not deciding the jurisdictional claims of the [Diocese] . . . ." The court thereupon requested the parties to address the jurisdictional issue. Counsel for the Diocese, however, indicated that he first wished to address the court's decision to open the new file. Counsel then urged the court to reconsider that decision, asserting that, despite the court's assurances to the contrary, any action that the court might take in that matter necessarily would affect the withdrawn cases, thereby constituting "an end run around the jurisdictional issue on part of the applicant . . . ."[13] The court responded that "these applications need to be addressed in open court, and the means of doing that, the most expeditious way, is

---

[12] The Diocese also raised several other arguments in support of its objection to the Times' March 26, 2002 motion, including: violation of its rights under the federal and state constitutions; failure of the Times to establish sufficient reason to vacate the protective orders; limitations on the disclosure of sealed documents in the possession of the court; the applicability of various privileges; failure of the Times to give adequate notice to the affected parties; and unfair prejudice to the Diocese resulting from the expedited scheduling of the hearing on the Times' motion.

[13] In opposing the Times' application to open a new file, counsel for the Diocese also noted that some of the parties to the withdrawn cases might not have received adequate notice of the opening of the new file.

to open a new file . . . ." After reiterating that the opening of a new file was "not a resolution of the jurisdictional issue," the court stated, "we're going to address [the jurisdictional issue] now."

The court then proceeded to hear the parties on the issue of jurisdiction. The Diocese asserted that, because the Times had failed to file a motion to open or to restore the withdrawn cases to the docket within the four month limitation period of § 52-212a, the Times' claims were foreclosed by that statutory provision. In response, the Times argued that § 52-212a was not a bar to the relief sought because the court had continuing jurisdiction over the cases by virtue of its inherent authority to modify and to enforce court orders that are injunctive in nature and that previously had been issued in those cases.

At the conclusion of the argument on the issue of jurisdiction, the court stated: "We'll continue with [a] discussion on the merits. I believe [this court has] jurisdiction, certainly with respect to what is in the clerk's office in sealed envelopes. . . . So we will move on to the merits."[14] Counsel for the Diocese then asked: "What Your Honor just said is not a ruling, it's going to be subject to further briefing . . . ?" The court responded: "Yes, it will be subject to further briefing. Yes, you can address the jurisdictional issue, but my determination is that [this court does] have jurisdiction, at least with respect to what's been sealed in the files." Counsel for the Diocese inquired: "Your Honor is ruling on that point today?" The court responded: "Yes, subject to

[14] The trial court also stated that it did not believe that it had "jurisdiction to order the parties to file anything, so I really don't feel that there's jurisdiction to enter that type of order." This comment was a reference to the Times' request in its motion and application for an order requiring the parties to file with the court discovery materials that previously had been exchanged only between the parties. See footnote 5 of this opinion. The Times has not challenged the propriety of the trial court's determination of that issue.

being revisited, but we are going to proceed with a discussion of the merits of the claim."

An extended discussion of the merits of the claims ensued.[15] At the conclusion of the hearing, the court requested that the parties brief several issues, including the principle of continuing jurisdiction and whether there existed other, independent grounds for the court's assumption of jurisdiction over the files in the court's possession. The court directed the parties to submit briefs by May 6, 2002, with reply briefs, if any, to be filed no later than May 9, 2002.

The following additional relevant facts and procedural history are set forth in the opinion of the Appellate Court and the record of the trial court. "On May 3, 2002, the Washington Post Company (Post), publisher of [T]he Washington Post, and the Globe Newspaper Company (Globe), publisher of [T]he Boston Globe,[16] filed motions to intervene that were substantially similar in content to the motion of the Courant. That same day, the Diocese filed three separate appeals from the trial court's [rulings] at the April [24], 2002 hearing. The defendants-appellants in each of those appeals [were] the Diocese; the Reverend Monsignor Thomas J. Driscoll, as the executor of the estate of the late Bishop Walter Curtis; the Reverend Monsignor Andrew T. Cusack; Bishop Edward M. Egan; the Reverend Monsignor Laurence R. Bronkiewicz; and any of the other defendants for whom two specified law firms representing the Diocese had an appearance on file. On May 6, 2002, a fourth appeal was filed by the first five of seven nonparty priests (John Doe priests) who had been per-

---

[15] During that discussion, counsel for the Times indicated that, to the best of his knowledge, notice of the Times' motion had been provided to all counsel of record in the twenty-three withdrawn cases, as well as to all pro se parties.

[16] We hereinafter refer to the Times, the Courant, the Post and the Globe, collectively, as the newspapers.

mitted by the Appellate Court to intervene as of right in the *Rosado* case two years earlier. See *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, 60 Conn. App. 134, 758 A.2d 916 (2000). The John Doe priests had requested permission to intervene for the purpose of filing motions to quash, for a protective order and for otherwise preventing disclosure of private, confidential information from their respective personnel files.[17] Id., 135.

"Each of the four appeals was taken from the trial court's [April 24, 2002] order restoring cases to [the] docket, after passage of more than four months since withdrawal. The third and fourth appeals also were taken from the court's decision to create a new file.

"Thereafter, the Diocese notified the court that it would not submit the requested brief in light of the automatic stay triggered by the filing of the four appeals. Nevertheless, on May 8, 2002, the court issued a memorandum of decision . . . addressing a broad range of procedural and substantive issues raised at the . . . hearing [on April 24, 2002]. On [May 8, 2002], the court also made rulings as to the sealed and protected materials.

---

[17] "In *Rosado*, the [trial court, *Skolnick, J.*] initially denied the motion of the seven John Doe priests, who previously had been granted permission to use the fictitious names of the Reverend John Does one through seven, for permission to intervene as of right. See *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, 60 Conn. App. 135 n.3. The John Doe priests then appealed to [the Appellate Court], which reversed the trial court's decision. Id., 153. [The Appellate Court] concluded that there was clearly no party charged by law with representing their interests and remanded the matter with direction to grant the nonparty priests intervention as of right. Id. The [trial] court granted the John Doe priests intervenor status, and the intervening priests filed a motion to quash subpoenas, for a protective order and for a stay to prevent disclosure of private and personal information contained in their personnel files. At the time the *Rosado* case was withdrawn, the [trial] court had not yet ruled on the motion to quash." (Internal quotation marks omitted.) *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, 77 Conn. App. 701 n.13.

"In its memorandum of decision, the court initially stated that the Times had not requested adjudication of its motion to intervene on April 10, 2002; therefore, the subject memorandum would not decide that motion . . . but instead would address [inter alia] the Times' request to vacate . . . [the] protective orders . . . ." *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, 77 Conn. App. 700–702. The trial court further stated that, because the twenty-three cases involving the Diocese had been withdrawn more than one year before the Times filed its March 26, 2002 motion, the clerk's office was unable to docket the Times' motion due to the four month limitation period of § 52-212a. The court also noted that, although the files in those cases were subject to destruction on March 12, 2002,[18] the clerk's office had not destroyed them as of March 26, 2002, the date of the Times' motion. Consequently, those files, including the sealed materials relating to them, remained in the custody and control of the Waterbury Superior Court and its clerk's office. Finally, the court explained that, after discussing the matter with the clerk's office and the presiding civil judge of the judicial district of Waterbury, it had determined that "opening a new file would serve as the most efficient tool for resolving the issues raised by the Times' [motion]."

With respect to the automatic stay provision of Practice Book § 61-11 (a),[19] the trial court stated that that provision did not affect its "jurisdiction and obligation to resolve the issues presented by the Times' applica-

[18] See footnote 6 of this opinion.

[19] Practice Book § 61-11 (a) provides in relevant part: "Except where otherwise provided by statute or other law, proceedings to enforce or carry out the judgment or order shall be automatically stayed until the time to take an appeal has expired. If an appeal is filed, such proceedings shall be stayed until the final determination of the cause. . . ."

tion."[20] In support of its conclusion, the trial court explained "that it had not rendered judgment on the application at the April [24], 2002 hearing and that any characterization of its actions as restoring cases to the docket was 'completely erroneous.' The court [also] explained that it had indicated during the hearing that it did not have jurisdiction over the parties, [that] it was not entering rulings in the twenty-three withdrawn cases and [that] none of the files in the twenty-three cases had been opened, despite the fact that the clerk had entered appearances, sua sponte, in the new case file, created at the court's direction, for all of the firms that had represented the parties in the twenty-three withdrawn cases."[21] *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, 77 Conn. App. 703.

"The [trial] court concluded that Practice Book § 17-4[22] and . . . § 52-212a, which deprive the court of jurisdiction after the passage of four months from the filing of a judgment or withdrawal, were intended to address the court's personal jurisdiction over the parties. The court added that several authorities, including General

[20] "In light of the [trial] court's prior statement that it had opened a new file at the April [24], 2002 hearing, we interpret its subsequent comments regarding the 'application' to refer to the Times' contemporaneous request to vacate the . . . protective orders in *Rosado, Fleetwood* and *See.*" *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, 77 Conn. App. 703 n.17.

[21] "The corrected record indicates that the appearances were not entered properly and that two of the John Doe priests were not notified properly of the new proceeding." *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, 77 Conn. App. 703 n.18.

[22] Practice Book § 17-4 provides in relevant part: "(a) Unless otherwise provided by law and except in such cases in which the court has continuing jurisdiction, any civil judgment or decree rendered in the superior court may not be opened or set aside unless a motion to open or set aside is filed within four months succeeding the date on which notice was sent. The parties may waive the provisions of this subsection or otherwise submit to the jurisdiction of the court. . . ."

Practice Book § 17-4 mirrors § 52-212a. See footnote 1 of this opinion.

Statutes § 51-52 (b)[23] . . . and Practice Book § 7-7,[24] 'all state the obvious, [namely] that the court has custody and control of its own files.' " (Citation omitted.) Id., 703–704. The trial court further stated that, "[i]n the absence of the court asserting jurisdiction over its own files, how are the public and the parties to resolve disputes relating to files remaining in the custody of the court for at least eight months after the expiration of the four month period to reopen? If not resolved through the judicial process, then resolution of such disputes would result at the discretion of the clerk's office or by physical altercation. The court finds that it is essential to the exercise of its inherent powers that the court retain jurisdiction over files that are in its custody."[25]

"The [trial] court described the Diocese's 'purported "appeal" of a decision never entered by [that] court'

---

[23] General Statutes § 51-52 (b) provides in relevant part: "Each clerk of court may store the inactive records of his court in any place of safekeeping designated by the Chief Court Administrator and may place the records in the direct custody of the records management officer or other designee of the Chief Court Administrator. The records management officer or designee shall be charged with the safekeeping of the records . . . and, when requested, may certify copies of the records."

[24] Practice Book § 7-7 provides: "Clerks will not permit files, records, transcripts, or exhibits to be taken from their offices, except for use in the courtroom or upon order of a judicial authority. No person shall take any file from the custody of the clerk or from the courtroom without the express authority of a judicial authority or a clerk of the court and unless a proper receipt is given to the clerk on a form prescribed by the office of the chief court administrator."

[25] With respect to the nature of the sealed documents in its possession, the trial court observed that its "review of what has been marked sealed by the clerk's office [reveals] seven boxes of documents including pleadings, transcripts of court proceedings, court rulings and other material which cannot fall within the parameters of an order issued pursuant to [law]." Our review of the sealed documents also reveals that numerous boxes of materials relating to the withdrawn cases have been sealed. Some of those materials were sealed pursuant to the protective orders at issue in this case whereas other materials apparently were sealed pursuant to orders unrelated to those protective orders.

as part of its continuing effort to frustrate the court's adjudication of a matter of public interest. Although acknowledging that withdrawal of the cases had precluded resolution of the . . . claims [raised by the various plaintiffs in those cases], the court asserted that 'the judicial system should not be a party to a cover-up by denying access' to information concerning a matter of such widespread public interest. The [trial] court warned against any 'facilitation of the cover-up by the courts' and noted the 'public's right to review the workings of government, including its judicial system, is widely acknowledged.' " *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, 77 Conn. App. 704.

"The court stated that it was ready to perform its 'duty' to adjudicate the Times' application,[26] the very application that the court had invited, and ordered the disclosure of any nonprivileged sealed records in the twenty-three cases on the basis of an extraordinary legitimate public interest. The court noted that the most comprehensive . . . protective order in the files was the *Rosado* order[27] . . . but rejected the notion that the order had become permanent when the case was withdrawn. Rather, the court found that the *Rosado* order [was] temporary and had ended by its own terms with the avoidance of trial by settlement, and that even if the order had not expired, the court retained continuing jurisdiction over the sealed materials pursuant to § 52-212a. The court concluded that no valid order remained denying the public access to materials in the sealed files.

"The court finally ordered that any claims of privilege regarding the sealed and protected documents be submitted in a privilege log no later than May 15, 2002, for consideration at a hearing to be held on May 24, 2002,

[26] See footnote 20 of this opinion.
[27] See footnote 9 of this opinion.

when the claims would be decided. The court envisioned that such claims would be limited to psychiatric records or documents naming the John Doe priests. The court also ordered that documents in the twenty-three cases currently designated as sealed, but not designated as privileged by May 15, 2002, be available for public examination on May 16, 2002. The court denied the Times' request that all other discovery materials be filed with the court.

"On May 9, 2002, the defendants[28] filed with [the Appellate Court] a motion for review and a motion for supervision of trial court proceedings pending appeal. On May 10, 2002, [the Appellate Court] ordered counsel to file simultaneous briefs, to appear at an en banc hearing and to give reasons why the appeals from the April 24, 2002 hearing should not be dismissed for lack of a final judgment. [The Appellate Court] also ordered, sua sponte, that all trial court proceedings . . . [and] the orders of May 8, 2002, regarding the release of sealed documents . . . be stayed pending further order of [the Appellate Court]. In a supplementary order dated May 13, 2002, [the Appellate Court] ordered counsel to address in their briefs whether the issue of the trial court's jurisdiction was properly before [the Appellate Court] on appeal from the April 24, 2002 hearing, or whether it should be raised on appeal from the May 8, 2002 [orders].

"During the en banc hearing, discussion turned to the newspapers' status. Noting that the trial court appeared to have granted the substantive relief requested without having acted on the motions to intervene, [Appellate Court] panel members questioned the newspapers' standing to participate in the appeal. Counsel for the Times ultimately conceded that the [trial]

[28] In this context, the "defendants" include those defendants that appealed from the trial court's April 24, 2002 rulings.

court had not acted on the motions to intervene, that the newspapers had no greater standing in the cases than any other member of the public and that counsel for the newspapers were present at the hearing only because they had received notice of the appeal and the court's order requesting briefing. At the conclusion of the hearing, [the Appellate Court] marked the jurisdictional question 'off,' directed the trial court to act on the pending motions to intervene and lifted the stay for that limited purpose. [The Appellate Court] also ordered the trial court to 'articulate the basis for its authority to open a new file at the request of a nonparty, who was not granted intervenor status, over the objections of the parties, more than 120 days after the withdrawal of the actions.' Finally, [the Appellate Court] ordered that the parties and proposed intervenors address that issue in their briefs on the merits, as well as the issue of the trial court's authority to grant party status to the Times and the Courant.

"On May 21, 2002, the Reverend Charles Carr and the Reverend Walter Coleman filed an appeal from the trial court's May 8, 2002 orders [purporting to restore the] cases to the docket, after the passage of more than four months from the date of withdrawal, and creating a new file. On May 28, 2002, three more appeals were filed from the May 8 [orders].[29] The second appeal was filed by the Diocese; the Reverend Driscoll, as the executor of the estate of the late Bishop Curtis; the Reverends Cusack and Bronkiewicz; Bishop Egan; and any

---

[29] "The appeal forms state that the second and third appeals were taken from the court's May 8, 2002 ruling that it had the authority or jurisdiction to act in the underlying cases after the passage of more than four months from the date of their withdrawal, and from its order to disclose confidential, judicially protected documents. The fourth appeal was taken from the court's May 8, 2002 order restoring cases to the docket after more than four months from the date of their withdrawal, the creation of a new case file and the order to unseal the previously sealed files." *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, 77 Conn. App. 707 n.25.

other defendants for whom the two specified law firms representing the Diocese had an appearance on file. The third appeal was filed by the John Doe priests numbers one through five. The fourth appeal was filed by Father Martin Frederici.

"On June 7, the trial court issued a document indicating that 'all pending motions to intervene in the above captioned matter,' namely, the file designated in the order as *Application of New York Times* v. *Sealed Records*, [Superior Court, judicial district of Waterbury, Docket No.] X06-CV-02-0170932-S, which the court had created, sua sponte, without any summons, mesne process, service of process, bond[30] or recognizance,[31] had been granted. The document also indicated that 'any pending motions to intervene that [had] been filed in any of the cases brought against the [Diocese] and others, which cases were withdrawn in March, 2001,' had been denied.

"On June [13], 2002, the [trial] court issued a memorandum articulating the basis for its authority to open a new file. In its memorandum, the court first declared that it had subject matter jurisdiction over the files in its custody, and that the only actions it had taken at the April 24 [2002] hearing were to issue a briefing schedule and to assure those in attendance that it had no jurisdiction to order the parties to act in the twenty-three cases. The court explained that each of its decisions to date had been informed by the rules of practice dictating the expeditious resolution of issues created by

[30] "A bond is an obligation in writing under seal, which binds a principal as obligor to pay a sum certain to an obligee upon the [occurrence] of an event or condition. If a bond with surety is required, a person, firm or corporation, acting as a surety on the bond, engages in writing to be answerable for the performance of the principal on the bond." *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, 77 Conn. App. 708 n.26.

[31] "A recognizance is an oral acknowledgement of obligation before a duly qualified officer to be entered of record." *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, 77 Conn. App. 708 n.27.

orders sealing files,[32] which efforts had been rendered futile by the June 5, 2002 orders of [the Appellate Court].

"The [trial] court further explained that the clerk of the court had date stamped the [Times'] emergency motion in the three captioned cases, but had not been able to docket the motion in those three files because the cases had been withdrawn more than one year earlier and could not be restored to pending status. The court, therefore, had determined, after discussing the matter with the clerk's office and the presiding civil judge of the Waterbury judicial district, that the most efficient tool for resolving the issues raised would be to invite the Times to file a separate application for the relief requested in its [motion].[33] Accordingly, following receipt of the Times' application, the [trial] court

[32] The court relied on Practice Book (2002) § 11-20 (e) and Practice Book § 77-1.

Practice Book (2002) § 11-20 (e) provides: "With the exception of orders concerning the confidentiality of records and other papers, issued pursuant to General Statutes § 46b-11 or any other provision of the general statutes under which the court is authorized to seal or limit the disclosure of files, affidavits, documents or other materials, whether at a pretrial or trial stage, any person affected by a court order that seals or limits the disclosure of any files, documents or other materials on file with the court or filed in connection with a court proceeding, shall have the right to the review of such order by the filing of a petition for review with the appellate court within seventy-two hours from the issuance of such order. Nothing under this subsection shall operate as a stay of such sealing order."

Practice Book § 77-1 provides in relevant part: "(a) Except as provided . . . any person affected by a court order which prohibits the public or any person from attending any session of court, or any order that seals or limits the disclosure of files, affidavits, documents or other material on file with the court or filed in connection with a court proceeding, may seek review of such order . . . .

"Any party or nonparty who sought such order may file a written response within ninety-six hours after the filing of the petition for review. . . .

"The appellate court shall hold an expedited hearing on any petition for review. . . . After such hearing the appellate court may affirm, modify or vacate the order reviewed. . . ."

[33] As we noted previously, the trial court's articulation on this point was a reiteration of the explanation that the court had given in its May 8, 2002 memorandum of decision.

opened a new file on April 18, 2002. The court empha-
sized that the motion had been placed in the new file
to preserve its content, the file merely serving as a
vehicle for compiling all of the papers related to the
application and facilitating presentation of the Times'
claims.

"The [trial] court stated that . . . it had [granted]
. . . the motions to intervene filed by the Courant, the
Globe and the Post in the newly opened file,[34] [but that]
it had not done so in the twenty-three withdrawn cases
because the motion[s] had not been docketed in those
files." *Rosado* v. *Bridgeport Roman Catholic Diocesan
Corp.*, supra, 77 Conn. App. 704–10. The trial court
noted that it did not open the withdrawn files because
they "could not be restored to pending status."

"[T]he [trial] court [further] articulated that inactive
files are in the custody of the court pursuant to . . .
§ 51-52 (b) and Practice Book § 7-7,[35] and that the court's
authority to open a new file is derived from its inherent
power and duty to address the complaints, applications
and petitions that are presented to it. The court stated
that its obligation to address such matters was espe-
cially compelling in the present circumstances, [in
which] 'interpretation and clarification of court orders
is required.' . . .

"The [trial] court stated that it had interpreted and
clarified the scope, duration and application of the seal-
ing orders in the May 8, 2002 memorandum of decision,
citing as authority [among other cases] *AvalonBay
Communities, Inc.* v. *Plan & Zoning Commission*, 260
Conn. 232, [246] 796 A.2d 1164 (2002) . . . [in which

[34] The trial court indicated that it was not necessary for the court to grant
the Times party status in the newly opened case file because the Times,
acting as the public's representative, was, itself, the applicant seeking to
have that new case file opened.

[35] See footnote 24 of this opinion.

we concluded that a trial court's continuing jurisdiction is rooted in its inherent power to effectuate its prior judgments].[36] . . . The [trial] court [also] stated that it would have been a dereliction of its duty, and morally and legally indefensible, 'to ignore its inherent power over its own files behind the fig leaf of a hypertechnical understanding of its jurisdiction . . . .' " *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, 77 Conn. App. 710–11.

Thereafter, the Appellate Court addressed the defendants' appeals,[37] turning first to the appeals relating to the actions taken by the trial court at the April 24, 2002 hearing. The Appellate Court concluded, preliminarily, that the trial court, despite its express representations to the contrary, effectively had restored the withdrawn cases to the docket by asserting jurisdiction over the sealed court files in those cases. Id., 717–18, citing *CFM of Connecticut, Inc.* v. *Chowdhury*, 239 Conn. 375, 391, 685 A.2d 1108 (1996) (concluding that action of trial court in connection with withdrawn case was functional equivalent of restoring case to docket), overruled in part on other grounds by *State* v. *Salmon*, 250 Conn. 147, 735 A.2d 333 (1999). In light of that determination, the Appellate Court further concluded that the trial court's assertion of jurisdiction over those files and its "restoration" of the cases to the docket constituted an appealable final judgment. *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, 77 Conn. App. 714–15, 719–20, citing *Solomon* v. *Keiser*, 212 Conn. 741, 747–48, 562 A.2d 524 (1989) (order of trial court opening judgment is appealable final judgment when

---

[36] We note that our opinion in *AvalonBay Communities, Inc.*, was issued on May 21, 2002, approximately two weeks after the trial court's May 8, 2002 memorandum of decision, and approximately three weeks before the trial court's June 13, 2002 articulation.

[37] In this context, the "defendants" include those defendants that appealed from the trial court's April 24, 2002 rulings or the trial court's May 8, 2002 orders.

issue raised is power of court to open judgment), and *Sicaras* v. *Hartford,* 44 Conn. App. 771, 775–76, 692 A.2d 1290 (for final judgment purposes, order restoring withdrawn case to docket is analogous to order opening judgment), cert. denied, 241 Conn. 916, 696 A.2d 340 (1997). The Appellate Court further held, however, that, because the cases had been withdrawn more than one year prior to the Times' request to unseal the court files relating to the withdrawn cases, the trial court was precluded from restoring the cases to the docket by virtue of the four month limitation period of § 52-212a. See *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.,* supra, 77 Conn. App. 720, 747. The Appellate Court, therefore, reversed "[t]he decision of the trial court granting the Times' [motion to vacate the protective orders] and the court's subsequent orders concerning the disclosure of the sealed and protected materials"; id., 747; without either deciding whether the trial court effectively had permitted the newspapers to intervene in the withdrawn cases; id., 720 n.32; or reaching the merits of the second set of appeals from the trial court's May 8, 2002 orders. Id., 747.

We subsequently granted the newspapers' petitions for certification to appeal limited to the following question: "Did the Appellate Court properly conclude that the trial court improperly granted the application to create a new file?" *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.,* 266 Conn. 906, 832 A.2d 71 (2003). Upon review of the record and the briefs of the parties, and after due consideration of the claims raised by the parties at oral argument, we conclude that the certified question is not an adequate statement of the multiple issues raised by this appeal. Consequently, it is necessary to reformulate and to expand the certified question to reflect more accurately the issues presented. See, e.g., *Stamford Hospital* v. *Vega,* 236 Conn. 646, 648 n.1, 674 A.2d 821 (1996) (this court may modify certified

questions to render them more accurate in framing issues presented). We therefore set forth the following revised certified questions: (1) Did the Appellate Court properly conclude that the trial court effectively restored the withdrawn cases to the docket, thereby giving rise to an appealable final order? (2) If so, did the trial court also effectively permit the newspapers to intervene in the withdrawn cases? (3) Did the Appellate Court properly conclude that the four month limitation period of § 52-212a deprived the trial court of the authority to restore the withdrawn cases to the docket and, if not, did the trial court abuse its discretion in restoring those cases to the docket? (4) Did the trial court abuse its discretion in permitting the newspapers to intervene in the withdrawn cases?

With respect to the first revised certified question, we agree with the Appellate Court that the trial court, in asserting jurisdiction over the documents that had been filed with the court under seal in the withdrawn cases, effectively restored those cases to the docket. We also agree with the Appellate Court that the trial court's restoration of the withdrawn cases to the docket constituted an appealable final order. With respect to the second revised certified question, we conclude that the trial court effectively permitted the newspapers to intervene in the withdrawn cases. With respect to the third revised certified question, we conclude that the trial court retained continuing jurisdiction over the withdrawn cases insofar as the documents filed under seal in those cases are concerned and, therefore, that the Appellate Court improperly determined that the four month limitation period of § 52-212a deprived the trial court of jurisdiction over the Times' claim that the protective orders should be vacated. We also conclude that the trial court did not abuse its discretion in restoring the withdrawn cases to the docket. With respect to the fourth revised certified question, we conclude that

■■■■■■■■■■■■■■■■■

the trial court did not abuse its discretion in permitting the newspapers to intervene in the withdrawn cases for the limited purpose of litigating the issue of whether the protective orders in those cases should be vacated or otherwise modified. We also conclude, however, that the trial court, in its May 8, 2002 memorandum of decision, improperly purported to adjudicate the merits of the Times' claim that the protective orders should be vacated or otherwise modified in violation of the automatic stay provision of Practice Book § 61-11. In light of these conclusions, we reverse the judgment of the Appellate Court and remand the case to that court with direction: (1) to affirm the decision of the trial court effectively restoring the withdrawn cases to the docket and granting intervenor status to the newspapers; (2) to vacate the orders issued in connection with the trial court's May 8, 2002 memorandum of decision; and (3) to remand the case to the trial court for a de novo determination of the merits of the Times' request to unseal the court files in the withdrawn cases.[38]

[38] In light of our resolution of the revised certified questions, we do not address the alternative arguments that the newspapers raise in support of their contention that the court possessed authority to adjudicate the merits of the Times' claim that the protective orders should be vacated, namely, that: (1) the protective orders had expired and, therefore, did not bar the unsealing of the documents in the court's possession; (2) the language of the protective orders indicates that they are subject to subsequent review and modification by the court; and (3) to interpret § 52-212a to bar the Times' claim regarding access to the sealed documents would render that statutory section unconstitutional as applied in view of the public's federal and state constitutional right of access to judicial proceedings and documents. To the extent that any of the foregoing claims implicates the terms of the protective orders, the trial court, on remand, will have the opportunity to consider the terms of those orders in connection with its adjudication of the merits of the Times' motion to unseal the documents in the court's possession.

The newspapers also contend that the Times' motion to vacate the protective orders does not implicate the four month limitation period of § 52-212a because the motion properly is viewed as an "independent suit based upon [the newspapers'] constitutional rights and their efforts to end the violation of those rights wrought by state action." Consistent with that position, the newspapers presumably would have us jump directly to a review of the

## I

The first revised certified question, which implicates the subject matter jurisdiction of this court and the Appellate Court to entertain appeals stemming from the actions of the trial court at the April 24, 2002 hearing, consists of two subparts, namely, whether the Appellate Court properly concluded that the trial court, by virtue of its actions on April 24, 2002, effectively restored the withdrawn cases to the docket, and, if so, whether the Appellate Court also properly concluded that the restoration of those cases to the docket constituted an appealable final order. We answer each of these two questions, which we address in inverse order, in the affirmative.

## A

As we repeatedly have observed, "[t]he right of appeal is purely statutory. It is accorded only if the conditions fixed by statute and the rules of court for taking and prosecuting the appeal are met. . . . Moreover, [t]he statutory right to appeal is limited to appeals by aggrieved parties from final judgments . . . . Because our jurisdiction over appeals . . . is prescribed by statute, we must always determine the threshold question of whether the appeal is taken from a final judgment before considering the merits of the claim." (Citations omitted; internal quotation marks omitted.) *Hartford Steam Boiler Inspection & Ins. Co.* v. *Underwriters at*

merits of the trial court's order unsealing the documents at issue. We decline the newspapers' invitation. The constitutional implications of the Times' motion do not alter the fact that the documents sought were filed under seal in the withdrawn cases and, therefore, the existence of those sealed files is linked inextricably to the withdrawn cases. Consequently, a new action seeking to have those documents unsealed would be tantamount to a motion to restore the withdrawn cases to the docket and, presumably, should be treated as such. In any event, we agree with the Appellate Court that to treat the Times' motion as a new lawsuit would be to ignore the fact that the motion was not styled as an independent action and it met none of the procedural requirements of such an action.

*Lloyd's & Cos. Collective*, 271 Conn. 474, 495, 857 A.2d 893 (2004), cert. denied, 544 U.S. 974, 125 S. Ct. 1826, 161 L. Ed. 2d 723 (2005). Thus, unless the actions of the trial court on April 24, 2002, constituted a final judgment for purposes of appeal, the Appellate Court was required to dismiss the defendants' appeals[39] for lack of subject matter jurisdiction. See, e.g., *Sweeney v. Sweeney*, 271 Conn. 193, 207–208, 856 A.2d 997 (2004). In concluding that it had jurisdiction to entertain the appeals, the Appellate Court analogized the effect of the trial court's actions on the withdrawn cases, that is, restoring them to the docket, to that of opening a judgment, which, in the circumstances presented, would provide the basis for an immediate appeal. See *Rosado v. Bridgeport Roman Catholic Diocesan Corp.*, supra, 77 Conn. App. 715–19.

Although "it is well established that an order opening a judgment ordinarily is not a final judgment [for purposes of appeal] . . . [t]his court . . . has recognized an exception to this rule [when] the appeal challenges the power of the court to act to set aside the judgment." (Citations omitted; internal quotation marks omitted.) *Solomon v. Keiser*, supra, 212 Conn. 746–47. Thus, "[a]n order of the trial court opening a judgment is . . . an appealable final judgment [when] the issue raised is the power of the trial court to open [the judgment]" in light of the four month limitation period of § 52-212a. Id., 747–48; see also *Connecticut Light & Power Co. v. Costle*, 179 Conn. 415, 418, 426 A.2d 1324 (1980). The Appellate Court, relying on its holding in *Sicaras v. Hartford*, supra, 44 Conn. App. 778, determined that, for final judgment purposes, an order restoring a withdrawn case to the docket is identical in all material respects to an order opening a final judgment when, as in the present case, a colorable claim challenging the authority of the trial court to restore the case to the docket is raised. See *Rosado v. Bridgeport Roman Cath-*

---

[39] See footnote 28 of this opinion.

*olic Diocesan Corp.*, supra, 77 Conn. App. 715–16. We agree.

In *Sicaras*, the Appellate Court considered whether the four month limitation period of § 52-212a applied to an order of the trial court restoring a case to the docket eleven months after it had been withdrawn. See *Sicaras* v. *Hartford*, supra, 44 Conn. App. 776. Analogizing withdrawals to final judgments, the Appellate Court answered that question in the affirmative; see id., 776, 778; noting, first, that "[t]he right of a plaintiff to withdraw his action before a hearing on the merits . . . is absolute and unconditional. Under [the] law, the effect of a withdrawal, so far as the pendency of the action is concerned, is strictly analogous to that presented after the rendition of a final judgment or the erasure of the case from the docket."[40] (Internal quotation marks omitted.) Id., 775–76, quoting *H. G. Bass Associates, Inc.* v. *Ethan Allen, Inc.*, 26 Conn. App. 426, 431, 601 A.2d 1040 (1992). The Appellate Court further explained that "the motion to restore a case to the docket is the vehicle to 'open' a withdrawal, while the motion to open is the vehicle to open judgments. . . . A motion to restore a case to the docket must have a jurisdictional time limitation in the same way as a motion to open." *Sicaras* v. *Hartford*, supra, 776–77. The Appellate Court thus concluded that "§ 52-212a applies to the restoration of a case to the docket as well as to the opening of judgments." Id., 778. We agree with both the logic and the conclusion of the Appellate Court in *Sicaras* that § 52-212a is applicable not only to the opening of a case that has proceeded to judgment but also to the restoration of a withdrawn case.

---

[40] This principle apparently derives from an earlier Supreme Court case, namely, *Lucas* v. *St. Patrick's Roman Catholic Church Corp.*, 123 Conn. 166, 170, 193 A. 204 (1937). See *Sicaras* v. *Hartford*, supra, 44 Conn. App. 776 (citing *Lucas*).

In the present case, the Appellate Court determined that, because, under *Sicaras*, the four month limitation period of § 52-212a applies to withdrawn cases, the restoration of such a case to the docket must be treated the same, for final judgment purposes, as the opening of a judgment, when the party challenging the restoration of the case to the docket raises a colorable claim that the court lacked the authority to do so by virtue of the limitation period of § 52-212a. See *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, 77 Conn. App. 715–16. The Appellate Court further determined that, because, under *Solomon* v. *Keiser*, supra, 212 Conn. 747–48, an order *opening* a judgment is immediately appealable when it is challenged on the basis of the court's authority to open the judgment in light of the four month limitation period of § 52-212a, an order *restoring* a case to the docket also must be immediately appealable when that order is challenged on the basis of the court's authority to restore the case to the docket in light of the limitation period of § 52-212a. *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, 77 Conn. App. 716. We agree with the Appellate Court that this conclusion follows necessarily upon application of the principles enunciated in *Solomon* and *Sicaras*. Accordingly, if, in the present case, the trial court is deemed to have restored the withdrawn cases to the docket, then a challenge based on the authority of the trial court to do so in light of the four month limitation period of § 52-212a rendered the trial court's restoration of the cases to the docket an immediately appealable final order. We turn, therefore, to the issue of whether the Appellate Court properly concluded that the trial court effectively restored the withdrawn cases to the docket.[41]

---

[41] We note that, in the Appellate Court, the newspapers had maintained, inter alia, that that court lacked subject matter jurisdiction over the defendants' appeals because the court's actions at the April 24, 2002 hearing did not constitute an appealable final judgment. Our review of the briefs that the newspapers filed in this court reveals that the newspapers have not

B

In *CFM of Connecticut, Inc.* v. *Chowdhury*, supra, 239 Conn. 375, this court was required to decide, inter alia, whether the trial court had jurisdiction to act on an order that had been issued in a withdrawn case even though no motion to restore the case to the docket had been filed and the trial court had not purported to grant such a motion. See id., 389. We concluded that, if the trial court had been "required to grant a motion to restore the case to the docket before [acting on the order], we can only regard [the court's] actions as the functional equivalent of the granting of such a motion." Id., 391. "To read the record any other way would be to blink at reality. Under the unique circumstances . . . [the court's] action on the motions that were before [it] must be deemed to be the equivalent of restoring the case to the docket for the purpose of exercising the court's inherent powers to enforce its orders and to provide for the due administration of justice." Id., 392; cf. *Solomon* v. *Keiser*, supra, 212 Conn. 747 (action of trial court in connection with case that previously had proceeded to judgment was functional equivalent of opening that judgment).

We agree with the Appellate Court that the same conclusion is mandated under the circumstances of the present case. As the Appellate Court explained, "the [trial] court exercised direct authority over the [withdrawn] cases, which had the same effect as restoring those cases to the docket." *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, 77 Conn. App. 716. "Despite the court's assertions to the contrary, and notwithstanding the absence of a formal motion to restore, [the creation of] the new file allowed the court

reasserted that claim expressly in the present appeal. We nevertheless address the issue because it implicates the authority of the Appellate Court, and of this court, to entertain the parties' claims, on appeal, arising out of the trial court's actions in connection with the April 24, 2002 hearing.

to conduct a full blown hearing on procedural and substantive issues, request that the parties file briefs and otherwise act as if it had restored the [withdrawn] cases to the docket. In one such act, the clerk of the court entered appearances in the new file, sua sponte, for law firms that had represented the parties in the twenty-three withdrawn cases, despite the fact that the firms themselves had not entered appearances on behalf of their former clients." Id., 718–19. In other words, "the [trial] court considered the [Times'] motion on its merits, just as it would have done had the Times filed, and the court granted, a motion to restore the [withdrawn] cases to the docket." Id., 716. Indeed, the trial court expressly and repeatedly represented that it had "jurisdiction" over the sealed documents and protective orders that were the subject of the Times' motion. Because the very existence of the documents and orders in the court files is bound inextricably to the withdrawn cases, such that the court could not have asserted its authority over those documents and orders without also assuming jurisdiction over the withdrawn cases of which they were a part, the trial court's exercise of jurisdiction over the documents and orders *necessarily* had the effect of restoring the withdrawn cases to the docket.[42]

It is important to note, moreover, that the Times' March 26, 2002 motion contained the *caption* of the *Rosado*, *See* and *Fleetwood* cases, and the Times requested the trial court's permission *to intervene in those withdrawn cases* for the purpose of seeking, inter

---

[42] Thus, we disagree with the trial court that, in removing the sealed documents and protective orders from the withdrawn cases and having them placed in a new file, that court then could properly treat those documents and protective orders as separate and distinct from the withdrawn cases themselves, thereby rendering § 52-212a inapplicable. Simply put, the documents and orders were, and remain, an integral part of the withdrawn cases, and the mere act of removing them from those case files cannot make it otherwise.

alia, an order vacating the protective orders that had been issued in those cases. The only reason that the Times' motion was treated as anything *other* than a request to have the withdrawn cases restored to the docket for that limited purpose was a misunderstanding, on the part of the trial court and court officials, that the clerk was precluded, as a matter of law, from docketing the Times' motion *as it was marked*.[43] The solution at which the court arrived, in consultation with court personnel, was to label the Times' motion as something that it was not, namely, a new case. Otherwise, in every pertinent respect, the trial court and the parties treated the Times' motion as the equivalent of a motion to have the withdrawn cases restored to the docket.[44] Thus, as we concluded in *Chowdhury*, the

---

[43] As the trial court explained in its articulation: "On March 26, 2002, [the Times] filed with the Waterbury Superior Court clerk's office an 'emergency motion' to vacate sealing orders, vacate protective orders and require filing of discovery materials in three of the twenty-three cases pending before [the trial] court prior to their final disposition by withdrawal on March 12, 2001. The motion promised in a footnote that '[a]lthough this motion addresses the three captioned-cases, [the Times] is seeking leave to file a consolidated omnibus motion requesting identical relief in the approximately twenty other sex abuse cases to which the [Diocese] is a party.' The clerk's office date-stamped the motions in the three cases, but these papers were not docketed by the clerk in the files bearing their captions because those three cases, as well as the twenty others, were withdrawn on March 12, 2001, and could not be restored to pending status.

"The clerk's office initially noted these practical problems and reported them to the presiding civil judge in [the judicial district of] Waterbury. Following consultation with the judicial branch court operations office, it was determined that the most effective way to deal with the Times' request to view sealed information within the possession of the court was to invite the Times to file an application for the relief requested in its motions. Accordingly, upon receipt of such application on April 18, 2002, a file was opened under the caption, *Application of The New York Times* v. *Sealed Files*, [Superior Court, judicial district of Waterbury, Docket No.] X06 CV 02 0170932 S, which file serve[d] as a vehicle for compiling all papers related to the Times' application and facilitating the presentment of its claims to the trial court."

[44] Indeed, at the April 24, 2002 hearing, the trial court invited the parties to address its continuing jurisdiction, under § 52-212a, even though the court had opened a new file for the purpose of entertaining the Times' March 26,

actions of the trial court reasonably cannot be treated as anything other than the restoration of the withdrawn cases to the docket.[45]

## II

Having concluded that the trial court effectively restored the withdrawn cases to the docket, we next consider whether the trial court also effectively permitted the newspapers to intervene in those cases. We conclude that the trial court did so.

As we have explained, the trial court treated the newly opened case as the operative case for the purpose of addressing the Times' motion to vacate the protective

2002 motion. Moreover, a review of the arguments made by the Times and the Diocese reveals the underlying assumption of the parties, shared by the court, that, notwithstanding the newly opened file, adjudication of the Times' motion nonetheless had the effect of restoring the withdrawn cases to the docket. For example, counsel for the Diocese asserted that § 52-212a precluded the court from adjudicating the Times' motion because the cases properly had been withdrawn "by consent and with prejudice, and no motion was ever made to reopen or restore [them] to the docket within four months . . . ." Counsel for the Times maintained, to the contrary, that the "continuing jurisdiction" exception to the four month limitation period of § 52-212a eliminated any jurisdictional barrier otherwise posed by that statutory provision.

[45] In light of our determination that the trial court effectively restored the withdrawn cases to the docket and, further, that the restoration of those cases to the docket constituted an appealable final order, the trial court's May 8, 2002 memorandum of decision, in which the court purported to address the merits of the Times' motion to vacate the protective orders, necessarily contravened the automatic stay provision of Practice Book § 61-11 (a). See footnote 19 of this opinion. Because we hereinafter conclude that the trial court effectively permitted the newspapers to intervene in the withdrawn cases; see part II of this opinion; properly restored the withdrawn cases to the docket; see part IV of this opinion; and properly permitted the newspapers to intervene in those cases; see part V of this opinion; we also conclude that the Times is entitled to an adjudication of the merits of its motion to vacate the protective orders. Because the trial court purported to decide the merits of that motion in contravention of Practice Book § 61-11, the orders issued in connection with the trial court's May 8, 2002 memorandum of decision must be vacated and the case reassigned for a de novo hearing before a different judge.

orders. Moreover, in its articulation, the trial court expressly granted the newspapers' motions to intervene in that new case.[46] As we also have explained, the court used that new case as a vehicle for asserting its authority over the documents and protective orders that were the subject of the Times' motion. We have concluded, however, that, in doing so, the trial court actually was asserting its jurisdiction over the *withdrawn cases,* thereby effectively restoring them to the docket. See part I of this opinion. In light of our conclusion that the trial court's act of opening a new case was the functional equivalent of restoring the withdrawn cases to the docket, the court's act of granting the newspapers party status in that new case necessarily was the functional equivalent of granting the newspapers intervenor status in the withdrawn cases.

Underscoring the trial court's express denial of the newspapers' motions to intervene in the withdrawn cases, the defendants[47] contend that it would be "odd" for us to construe the denial of a motion as the functional equivalent of granting the motion. We acknowledge that it is somewhat unusual for an appellate court to construe the actions of a trial court in a manner that contradicts the trial court's own characterization of its actions. In the present case, however, it is no less odd to reject the trial court's characterization of the effect of its actions concerning the motions to intervene than it is to reject, as we have, the trial court's characterization of its actions regarding the creation of a new case.

---

[46] As we have noted; see footnote 34 of this opinion; the trial court stated in its articulation that the Times did not need the court's permission to seek relief in connection with the newly opened case because the Times was the party that had applied to have the new case opened. For purposes of this appeal, however, the trial court's granting of the Times' application to open a new case and the court's granting of the newspapers' motions to intervene in that matter had the same effect, namely, affording each of those entities intervenor status in the withdrawn cases.

[47] See footnote 37 of this opinion.

More importantly, in view of our characterization of the trial court's actions regarding the newly opened case as the functional equivalent of restoring the withdrawn cases to the docket, it would be wholly illogical for us also to conclude that the trial court, in granting the newspapers' motions to intervene in that newly opened case, had not effectively permitted the newspapers to intervene in the withdrawn cases. Indeed, our conclusion that the trial court *actually* had asserted jurisdiction over the withdrawn cases rather than a new case file does not alter the fact that the trial court always had *intended* to afford the newspapers party status, at least with respect to the issue of the Times' request for access to the sealed court documents. Under the circumstances, therefore, it is clear that the effect of the trial court's actions was not only to restore the withdrawn cases to the docket but also to grant the newspapers intervenor status in those cases.

## III

Before addressing the propriety of the trial court's actions in effectively restoring the withdrawn cases to the docket and granting the newspapers' motions to intervene, we digress briefly to address several points made by the dissent. The dissent disagrees with our conclusion that "the Appellate Court properly treated the trial court's actions as the effective equivalent of allowing the [newspapers] to intervene in the withdrawn cases and restoring the cases to the docket." The dissent asserts that, "[a]lthough the trial court ruled unequivocally at the April 24, 2002 hearing that it had jurisdiction over the sealed documents, its ruling that it had jurisdiction to hear arguments on the merits of the Times' claim without restoring the cases to the docket pursuant to § 52-212a clearly was provisional." Accordingly, the dissent "conclude[s] that the court made no determination that can be treated as the functional equivalent of restoring the cases to the docket

and, therefore, that there was no appealable final judgment." Simply put, the dissent's contention—which has not been advanced by any party to this appeal—is unsupported by the facts. The dissent further contends that, even if it were to assume that the trial court effectively restored the withdrawn cases to the docket and granted the newspapers' motions to intervene in those cases, the trial court's ruling should be reversed because the court was required to determine—before allowing the newspapers to intervene for the purpose of addressing the merits of the Times' motion to vacate the protective orders—whether the defendants had "relied on the permanence of the protective orders in settling the cases . . . ." If so, the dissent contends, then the trial court was required to deny the newspapers' request to intervene in the absence of a showing by the newspapers of "an extraordinary circumstance" or "compelling need." This argument is not supported by the law.

As we have explained in part I of this opinion, at the hearing of April 24, 2002, the trial court first heard extensive argument by the parties as to whether it had jurisdiction over the claim of the Times that it was entitled to access to the sealed documents that the trial court had removed from the withdrawn cases and placed into the new case file. Indeed, the sole focus of the first half of the hearing was to determine whether the court had the authority to decide the merits of the Times' claim that it had a right of access to the documents that had been sealed in accordance with the protective orders.

At the conclusion of that portion of the hearing— that is, at the conclusion of the argument on the court's jurisdiction to entertain the merits of the Times' motion to vacate the protective orders—the court expressly informed the parties of its determination that it *had jurisdiction to decide the merits of the Times' motion.*

In particular, the court stated, "I believe I do have juris-diction, certainly with respect to what is in the clerk's office in sealed envelopes. . . . So, we will move onto the merits." Immediately thereafter, the court reiterated its conclusion in even more unequivocal terms, stating, "[M]y determination is that I do have jurisdiction, at least with respect to what's been sealed in the files."[48] Counsel for the Diocese then asked: "Your Honor is ruling on that point today?" The court responded, again unequivocally, in the affirmative. At the request of counsel for the Diocese "to further brief the jurisdictional issue," the court did agree to give the Diocese and other interested parties another "opportunity, [albeit] not a very lengthy one, to address [the] jurisdictional issues . . . ."[49] The record, however, is crystal clear that the court was willing to revisit that issue only because counsel for the Diocese had so requested. The court then turned to a discussion of the merits of the Times' motion, a discussion that occupied the balance of the hearing.

Despite the trial court's willingness to revisit its juris-dictional ruling, neither the Diocese nor any other party elected to file a supplemental brief in an effort to seek reconsideration of the trial court's ruling on the jurisdic-tional issue. Instead, the Diocese and certain other

---

[48] In concluding that it had jurisdiction *"certainly* with respect to" and *"at least* with respect to" the sealed files, the trial court merely was distin-guishing between the sealed documents that were in the possession of the court, on the one hand, and documents, also subject to the protective orders, that were in the possession of the parties, on the other. (Emphasis added.) As we have explained, the Times had claimed that it was entitled to docu-ments in the possession of the parties as well as to the sealed documents in the possession of the court. It is undisputed that the trial court concluded that it did not have jurisdiction over the documents in the possession of the parties.

[49] The trial court then proceeded to hear argument on the merits of the Times' motion to vacate the protective orders. At the conclusion of the hearing, the court also gave the parties an opportunity to brief supplemen-tally issues relating to the merits.

defendants chose to exercise their right to take immediate appeals from the court's ruling. Those appeals were taken properly because the court's ruling had the effect of restoring the withdrawn cases to the docket. See part I of this opinion. When the Diocese and other defendants took immediate appeals rather than accepting the trial court's invitation for further briefing,[50] or, put another way, when they opted to challenge the court's ruling on appeal rather than by way of reconsideration, the court had no reason to revisit its ruling, and, consequently, the ruling remained in effect, subject, of course, to any challenges on appeal.

Although it is clear from the record of the April 24, 2002 hearing that the trial court was asserting jurisdiction over the sealed documents and protective orders—and, therefore, effectively restoring the withdrawn cases to the docket—the court's articulation of June 13, 2002, reinforces this conclusion. For example, the court expressly noted that the only issue raised by the appeals was "whether *the trial court's April 24, 2002 determination that it had subject matter jurisdiction over its own files* was properly made on an application by [the Times]." (Emphasis added.) In characterizing the appeals in that manner, the trial court's point is unmistakable: the court had determined at the hearing of April 24, 2002, that it had jurisdiction over the sealed documents and protective orders. The court then proceeded to quote verbatim those portions of its comments at the April 24, 2002 hearing, to which we have referred previously, and, thereafter, explained that it had asserted jurisdiction over the sealed cases under its "inherent power" over files in the possession of the court and under its "inherent power" and "continuing jurisdiction" to issue postjudgment orders after the

---

[50] The trial court itself characterized its actions in precisely these terms in its memorandum of decision of May 8, 2002.

expiration of the four month limitation period of § 52-212a.

Contrary to the contention of the dissent, therefore, there is no doubt that the trial court was asserting jurisdiction over the sealed documents for the purpose of addressing the merits of the Times' motion to vacate the protective orders. Indeed, the clarity of the trial court's actions is reflected in the fact that, as we have indicated, *no party* to this appeal contests the Appellate Court's well reasoned conclusion that the trial court effectively restored the withdrawn cases to the docket. Only the dissent challenges that determination.

By contrast, the reasoning that the dissent advances in support of its conclusion that the trial court did not effectively restore the withdrawn cases to the docket is fundamentally flawed because it is founded on a wholly untenable assertion. Although the dissent concedes that the trial court ruled definitively, at the April 24, 2002 hearing, that it had jurisdiction over the sealed documents that were the subject of the Times' motion, it nevertheless asserts that the court ruled only *provisionally* that it had jurisdiction over the protective orders. Thus, according to the dissent, the court made two rulings: one, which was definitive, that pertained to its jurisdiction over the sealed documents, and a second ruling, which was provisional, that pertained to the court's jurisdiction over the protective orders. This assertion is untenable because there is absolutely nothing in the record to support it.

Despite the dissent's effort to separate the court's ruling on the protective orders from the court's ruling on the sealed documents, there is no principled way to do so. It is undisputed that the documents at issue are sealed and, therefore, are not available for inspection by the newspapers or the public, solely because of the protective orders that were issued in the cases in which

those documents were filed. For that reason, the parties' arguments at the hearing of April 24, 2002, necessarily focused on the documents *and* the protective orders, because they are inextricably intertwined. Indeed, the entire point of the initial, extended argument of the parties at the April 24, 2002 hearing—that is, that portion of the hearing that occurred before the trial court entertained argument concerning the merits of the Times' motion to vacate the protective orders—was whether the court had jurisdiction to address the Times' claim that the documents should be unsealed. In other words, the parties' argument addressed the issue of whether the court had jurisdiction to vacate or to modify the protective orders so that the newspapers and the public would be able to gain access to the documents. Therefore, the dissent's contention that the trial court ruled definitively that it had jurisdiction over the sealed files, but ruled only "provisional[ly]" that it had jurisdiction over the protective orders, is belied by the record of the hearing of April 24, 2002, and is predicated on a wholly artificial distinction, a distinction that no party to this appeal seeks to make.

The dissent's assertion also is contrary to the trial court's articulation of June 13, 2002. In that articulation, the trial court, in response to the order of the Appellate Court directing it to explain the basis of its decision to open a new file, stated, inter alia, that its "authority to open a file under [the] circumstances [of the present case] is essentially based in the inherent power of the trial court, and the duty of a trial court to address complaints, applications and petitions which are presented to it. This obligation is especially compelling under the circumstances here, where the court by law had custody of the files which were the subject of the application, *and interpretation and clarification of court orders is required.*" (Emphasis added.) Thus, the trial court was well aware that, if it concluded that it

had jurisdiction over the files in its possession, it also would be required to address the continued vitality of the protective orders. When, after hearing the parties on the issue, the court determined that it *did* have jurisdiction over the sealed files, the court necessarily also was exercising jurisdiction over the protective orders.[51]

The dissent's argument with respect to intervention also is without merit. The dissent asserts that "the trial court was required to consider whether the parties in the withdrawn cases had settled the cases in reliance on the permanence of the protective orders. If so, the court should not have granted the motions to intervene absent a showing of some extraordinary circumstance or compelling need." Although the dissent acknowledges that "[s]everal courts have recognized an exception to [the rule disfavoring intervention after an action has been terminated] when intervention is sought for the purpose of modifying a protective order entered in the terminated action," the dissent nevertheless contends that "the court must determine whether the par-

---

[51] It also is perfectly clear that the trial court effectively granted the newspapers' motions to intervene in the withdrawn cases. As we have explained, although the trial court denied the newspapers' motions to intervene in the withdrawn cases, the trial court granted the newspapers' motions to intervene in the new case, which case was the vehicle pursuant to which the court asserted jurisdiction over the sealed documents and orders that are the subject of the Times' motion to vacate the protective orders. Because the new case served as the vehicle by which the court assumed jurisdiction over those documents and orders, and because those documents and orders were part of the withdrawn cases, it necessarily follows that the court effectively granted the newspapers' motions to intervene in the withdrawn cases when it concluded that it had jurisdiction to entertain the merits of the Times' motion to vacate. Moreover, upon being directed by the Appellate Court to act on the newspapers' motions to intervene, the trial court, in its articulation of June 13, 2002, expressly granted those motions with respect to the new file. Thus, contrary to the contention of the dissent, the record clearly establishes that the trial court effectively restored the withdrawn cases to the docket and granted the newspapers' motions to intervene in those cases.

ties relied on the permanence of the protective orders in settling the cases *before* allowing intervention." (Emphasis in original.) The dissent's contention ignores the fact that, in all of the cases that the dissent cites for the proposition that a party reasonably may rely on the permanence of a protective order, that issue was addressed by the court in connection with the merits of the relief sought—that is, in connection with the question of whether to vacate the challenged protective orders—and not as a threshold question of intervention. See, e.g., *Securities & Exchange Commission* v. *TheStreet.com*, 273 F.3d 222, 229–31 (2d Cir. 2001); *In re Agent Orange Product Liability Litigation*, 821 F.2d 139, 147–48 (2d Cir.) cert. denied sub nom. *Dow Chemical Co.* v. *Ryan*, 484 U.S. 953, 108 S. Ct. 344, 98 L. Ed. 2d 370 (1987); *Federal Deposit Ins. Co.* v. *Ernst & Ernst*, 677 F.2d 230, 231–32 (2d Cir. 1982). Thus, the very cases on which the dissent relies undermine the dissent's position, a position that, so far as we can discern, finds no support in the relevant case law.

Finally, the dissent, in placing such singular importance on the parties' asserted reliance interest, wholly ignores the significant—and constitutionally based— public interest in judicial documents and the responsibility of the courts to protect that interest. Of course, a party's reasonable reliance on the continued vitality of a protective order is a factor that a court must weigh in deciding whether, under the particular facts and circumstances of the case, to vacate or to modify that order. But the dissent goes much farther, elevating that reliance to an exalted status that almost always will be outcome determinative in favor of the party seeking to block public access to court documents. Indeed, under the dissent's unprecedented view, the public will not even be afforded party status in its effort to obtain documents in the court's possession unless it *first* can establish an "extraordinary circumstance" or a "com-

pelling need" for the sealed materials. In requiring the public to establish a compelling need to overcome the parties' asserted interest in maintaining the secrecy of documents in the court's possession, the dissent improperly skews the analysis and bucks the strong consensus favoring disclosure of such documents in the absence of a need for continued secrecy. See parts IV and V of this opinion.

## IV

We next consider whether the trial court had the authority to restore the withdrawn cases to the docket notwithstanding the four month limitation period of § 52-212a and, if so, whether the court properly exercised that authority. We conclude that § 52-212a did not preclude the trial court from restoring the withdrawn cases to the docket because the court had continuing jurisdiction over those cases for the limited purpose of adjudicating the Times' claim regarding the sealed documents. We also conclude that the trial court acted within the scope of that authority in restoring the withdrawn cases to the docket.

## A

As a preliminary matter, we set forth the standards that guide our review of the trial court's actions regarding the withdrawn cases. Whether a court retains continuing jurisdiction over a case is a question of law subject to plenary review. See *AvalonBay Communities, Inc.* v. *Plan & Zoning Commission,* supra, 260 Conn. 239–40. Whether a court properly exercised that authority, however, is a separate inquiry that is subject to review only for an abuse of discretion. See id.

## B

We first must consider whether the trial court had the authority to restore the withdrawn cases to the docket, beyond the four month limitation period of § 52-

212a, under the continuing jurisdiction exception to that limitation period.[52] The newspapers contend that, because protective orders are injunctive in nature, the trial court had continuing jurisdiction to restore the cases to the docket by virtue of the court's inherent power to modify injunctions after the expiration of the four month period. We agree with the newspapers.

We recently had occasion to examine the underpinnings of a trial court's continuing jurisdiction in *AvalonBay Communities, Inc.* In that case, the plaintiff, AvalonBay Communities, Inc. (AvalonBay), applied to the defendant, the plan and zoning commission of the town of Orange (town), for approval to construct a luxury apartment complex that included units of affordable housing. Id., 234. The town rejected the application, and AvalonBay appealed to the Superior Court, which sustained the appeal and ordered the town to approve AvalonBay's application subject to any reasonable and necessary conditions that might be imposed by the town. Id., 234–35. Seven months later, the town approved AvalonBay's application subject to sixteen conditions. Id., 236. AvalonBay thereafter filed a motion for contempt in which it claimed, inter alia, that some of the conditions imposed by the town were unreasonable or inconsistent with the court's prior order and that others were not possible to perform. Id., 236–37. After a hearing, the trial court concluded that AvalonBay had not established grounds for contempt but nonetheless ordered the town to modify or to rescind some of the challenged conditions. Id., 237–38. The town appealed, claiming that, in the absence of a finding of contempt, the trial court lacked continuing jurisdiction over the case and that, because more than four months had passed since judgment was rendered in the

[52] As we have indicated; see footnote 2 of this opinion; continuing jurisdiction is the only exception to the four month limitation period of § 52-212a that is implicated in this case.

case, the court lacked the authority to direct that the town change the conditions of approval. Id., 238.

On appeal, we rejected the town's claim as predicated on a "hypertechnical understanding of the trial court's continuing jurisdiction to effectuate prior judgments." Id., 241. We concluded "that the trial court's continuing jurisdiction is not separate from, but, rather, *derives* from, its equitable authority to vindicate judgments." (Emphasis in original.) Id. On the basis of that determination, we held that "the trial court's continuing jurisdiction to effectuate its prior judgments, either by summarily ordering compliance with a clear judgment or by interpreting an ambiguous judgment and entering orders to effectuate the judgment as interpreted, is grounded in its inherent powers, and is not limited to cases [in which] the noncompliant party is in contempt, family cases, cases involving injunctions, or cases [in which] the parties have agreed to continuing jurisdiction." Id., 246.

In the course of our discussion of the trial court's inherent authority to effectuate its prior judgments more than four months after judgment has been rendered, we also expressly noted that "courts have inherent power to change or modify their own injunctions that is not limited by § 52-212a . . . ." (Citation omitted.) Id., 242 n.11, citing *Adams* v. *Vaill*, 158 Conn. 478, 482, 262 A.2d 169 (1969) ("[i]t cannot be doubted that courts have inherent power to change or modify their own injunctions [when] circumstances or pertinent law have so changed as to make it equitable to do so"); see also *O'Leary* v. *Industrial Park Corp.*, 211 Conn. 648, 652–53 n.2, 560 A.2d 968 (1989) (common law vests courts with continuing jurisdiction to modify their injunctions more than four months after judgment has been rendered). In light of the court's inherent authority to modify its injunctions, if, as the newspapers claim, a protective order is materially similar to an injunction,

then the trial court in the present case retained continuing jurisdiction, under its inherent power, to restore the withdrawn cases to the docket, more than four months after the withdrawal of the cases, for the limited purpose of determining whether the protective orders should be vacated or otherwise modified due to changed circumstances.

We agree with the newspapers that discovery related protective orders, like the protective orders issued in the withdrawn cases, are injunctive in nature. Such orders have both the force and effect of an injunction, and serve a similar equitable purpose, namely, to regulate prospectively the conduct of the parties, either by restraining them from acting or by requiring them to act under circumstances that, if not so regulated, could lead to unduly harmful consequences. In this respect, a protective order will be tantamount to a prohibitory injunction; see *Tomasso Bros., Inc.* v. *October Twenty-Four, Inc.*, 230 Conn. 641, 652, 646 A.2d 133 (1994) ("[a] prohibitory injunction is an order of the court restraining a party from the commission of an act"); or a mandatory injunction; see id. ("[a] mandatory injunction . . . is a court order commanding a party to perform an act"); or, like any other injunction, may have attributes of both. See id., 652 n.12. Moreover, a party who violates the terms of a protective order, like a party who violates the terms of an injunction, is exposed to liability for contempt.

Furthermore, once issued, protective orders, like injunctions, "need not remain in place permanently . . . and their terms are not immutable. It is well-settled that a trial court retains the power to modify or lift a protective order that it has entered." *Ballard* v. *Herzke*, 924 S.W.2d 652, 659 (Tenn. 1996). Indeed, "courts and commentators seem unanimous in finding . . . [that courts have] an inherent power to modify discovery-related protective orders, even after judgment, when

circumstances justify." *Public Citizen* v. *Liggett Group, Inc.*, 858 F.2d 775, 782 (1st Cir. 1988), cert. denied, 488 U.S. 1030, 109 S. Ct. 838, 102 L. Ed. 2d 970 (1989); see also *United Nuclear Corp.* v. *Cranford Ins. Co.*, 905 F.2d 1424, 1427 (10th Cir. 1990) ("[a]s long as a protective order remains in effect, the court that entered the order retains the power to modify it, even if the underlying suit has been dismissed"), cert. denied sub nom. *American Special Risk Ins. Co.* v. *Rohm & Haas Co.*, 498 U.S. 1073, 111 S. Ct. 799, 112 L. Ed. 2d 860 (1991). Consequently, "[a] protective order, like any ongoing injunction, is always subject to the inherent power of the [trial] court to relax or terminate the order, even after judgment." *Gambale* v. *Deutsche Bank AG*, 377 F.3d 133, 141 (2d Cir. 2004). "This retained power in the court to alter its own ongoing directives provides a safety valve for public interest concerns, changed circumstances or any other basis that may reasonably be offered for later adjustment." *Poliquin* v. *Garden Way, Inc.*, 989 F.2d 527, 535 (1st Cir. 1993); accord *Gambale* v. *Deutsche Bank AG*, supra, 141; see also *Hallett* v. *Carnet Holding Corp.*, 809 A.2d 1159, 1162 (Del. 2002). Thus, for all purposes relative to any protective order in the present case, "[d]uring the pendency of the . . . order, including times after [the withdrawal of the case], the order acted as an injunction, setting forth strict limitations on the parties' use of discovery materials." *Public Citizen* v. *Liggett Group, Inc.*, supra, 782. "In support of this 'injunction,' the [trial] court necessarily had the power to enforce the order, at any point while the order was in effect, including periods after [withdrawal]. . . . Correlative with this power to enforce, the [trial] court necessarily also retained power to modify the protective order in light of changed circumstances." Id.

Because protective orders operate like injunctions and have the same purpose and effect, and because

courts have inherent power to revisit protective orders or injunctions when a change in circumstances or pertinent law makes it equitable to do so, we see no reason why a protective order that remains in effect more than four months after judgment or withdrawal should be treated any differently, for purposes of § 52-212a, than an injunction that survives that four month period. We conclude, therefore, that, just as a court has continuing jurisdiction to vacate or to modify an injunction after the four month limitation period of § 52-212a has expired, so, too, does a court have continuing jurisdiction to vacate or to modify a protective order after the expiration of that limitation period.

This conclusion is consistent with, if not mandated by, two important and well established principles. First, courts retain supervisory authority over documents in their possession. E.g., *Nixon* v. *Warner Communications, Inc.*, 435 U.S. 589, 598, 98 S. Ct. 1306, 55 L. Ed. 2d 570 (1978). Second, the public has a presumptive right of access to court proceedings and documents. E.g., *United States* v. *Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995); see also *Doe* v. *Connecticut Bar Examining Committee*, 263 Conn. 39, 65 n.16, 818 A.2d 14 (2003). With respect to a court's supervisory authority over documents in its custody and control, that power is not forfeited merely because the parties have agreed to a settlement and withdrawal of the case. As the Second Circuit Court of Appeals recently has observed, "[t]he court's supervisory power [over documents in its possession] does not disappear because jurisdiction over the relevant controversy has been lost. The records and files are not in limbo. [As] long as they remain under the aegis of the court, they are superintended by the judges who have dominion over the court." *Gambale* v. *Deutsche Bank AG*, supra, 377 F.3d 141.

This supervisory role of the court in relation to its own files is an especially important one insofar as it

pertains to files that contain judicial documents—that is, documents that have been submitted to the court for its review in the discharge of the court's adjudicatory function—because "[t]he public has a common law presumptive right of access to [such] documents[53] . . . and likely a constitutional one as well."[54] (Citation omitted.) Id., 140; see also *Jessup* v. *Luther*, 277 F.3d 926, 927–28 (7th Cir. 2002) ("The general rule is that the record of a judicial proceeding is public. . . . Not only do such records often concern issues in which the public has an interest, in which event concealing the records disserves the values protected by the free-speech and free-press clauses of the First Amendment, but also the public cannot monitor judicial performance adequately if the records of judicial proceedings are secret." [Citations omitted.]). Although that presumptive right of access is not absolute and, therefore, may yield upon demonstration of a compelling reason for secrecy; e.g., *Gambale* v. *Deutsche Bank AG*, supra, 377

---

[53] With respect to this right of access, it has been aptly stated that "[t]he public's exercise of its common law access right in civil cases promotes public confidence in the judicial system . . . . As with other branches of government, the bright light cast upon the judicial process by public observation diminishes the possibilities for injustice, incompetence, perjury, and fraud. Furthermore, the very openness of the process should provide the public with a more complete understanding of the judicial system and a better perception of its fairness." (Citation omitted.) *Littlejohn* v. *Bic Corp.*, 851 F.2d 673, 678 (3d Cir. 1988); accord *United States* v. *Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995).

[54] As to the issue of what documents are judicial documents, we agree generally that "the mere filing of a paper or document with the court is insufficient to render that paper a judicial document subject to the right of public access. . . . [T]he item filed must be relevant to the performance of the judicial function and useful in the judicial process in order for it to be designated a judicial document." *United States* v. *Amodeo*, supra, 44 F.3d 145. Whatever the precise parameters of that category of documents may be, however, we also agree that "the presumptive right to 'public observation' is at its apogee when asserted with respect to documents relating to 'matters that directly affect an adjudication.' " *Gambale* v. *Deutsche Bank AG*, supra, 377 F.3d 140, quoting *United States* v. *Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995).

F.3d 140; *Jessup* v. *Luther*, supra, 277 F.3d 928; parties
to litigation nevertheless "cannot expunge the public
interest by the simple expedient of filing a [withdrawal
of action] with the court. The public's stake in the pro-
priety and particulars of the court's adjudication does
not evaporate upon the parties' subsequent decision to
settle."[55] *Gambale* v. *Deutsche Bank AG*, supra, 140.
Indeed, our review of the sealed documents at issue in
the present case reveals that many of those documents
are judicial documents.

*Gambale*, a case that is strikingly similar to the pre-
sent case in all material respects, provides persuasive
support for the conclusion that a court possesses inher-
ent power to modify a protective order concerning doc-
uments in its possession even though it otherwise may
lack the authority to adjudicate the substantive rights
of the parties to the case in which the protective order
was issued. In *Gambale*, the plaintiff, Virginia Gambale,
a former managing director employed by the defendant,
Deutsche Bank AG (bank), brought an action against
the bank alleging that it had discriminated against her
on the basis of her sex and had retaliated against her
for complaining about it. Id., 135. After pretrial discov-
ery, the bank filed a motion for summary judgment. See
id. Gambale's response to the bank's motion included
certain documents that she filed with the District Court
under seal in accordance with a protective order that
the court previously had entered. Id. Thereafter, the
District Court granted the bank's motion for summary

[55] The public's presumptive right of access to court proceedings and docu-
ments is embodied in our rules of practice. "Practice Book § 11-20 provides,
in general terms, that the public may not be excluded from judicial proceed-
ings, and that records of court proceedings may not be sealed, unless the
court identifies, on the record and in open court, 'an interest which is
determined to override the public's interest in attending such proceeding or
in viewing such materials.' " *Doe* v. *Connecticut Bar Examining Committee*,
supra, 263 Conn. 67–68.

judgment as to one of Gambale's claims, but denied the motion as to a number of other claims. Id., 136.

Shortly thereafter, the parties advised the District Court that they had settled the action on a confidential basis. Id. The District Court indicated that it disagreed with the parties regarding the propriety of keeping the settlement agreement confidential. Id. Approximately three weeks after they had advised the District Court that they had settled, the parties filed a stipulation of dismissal with prejudice as permitted by the federal rules of civil procedure. Id., 137; see Fed. R. Civ. P. 41 (a) (1) (ii). The bank also sent the District Court a letter asserting that, as a result of the stipulated dismissal of the action, the court no longer had jurisdiction over the case and, therefore, had no authority to permit disclosure of the settlement terms or to unseal any documents related to the action or the settlement. *Gambale* v. *Deutsche Bank AG*, supra, 377 F.3d 137.

The District Court, however, issued an order unsealing the sealed documents that Gambale had filed in opposition to the bank's motion for summary judgment.[56] The District Court explained that, despite the parties' settlement and stipulation of dismissal, the court continued to have jurisdiction over the judicial documents filed with the court in connection with the litigation. Id. The District Court further noted that the bank had failed to demonstrate that its privacy interests in those documents overcame the presumption of access to those documents. Id., 138. The bank appealed from the District Court's order unsealing the documents, claiming, inter alia, that the trial court had no jurisdiction to issue the unsealing order after the filing of the stipulation of dismissal. Id., 135.

Although the Second Circuit Court of Appeals acknowledged that the filing of a stipulation of dismissal

---

[56] The court issued the order sua sponte. *Gambale* v. *Deutsche Bank AG*, supra, 377 F.3d 134, 138.

generally "divests the court of its jurisdiction over a case, irrespective of whether the . . . court approves the stipulation"; id., 139; it stated further that "[i]t simply does not follow . . . that the filing of a stipulation of dismissal divests a court of jurisdiction either to dispose of material in its files as it thinks appropriate or to modify or vacate its own protective orders with respect to such documents." Id., 139–40. After underscoring the public's presumptive right of access to judicial documents, the District Court's supervisory authority over documents and files in its possession and that court's inherent power to modify or to terminate protective orders at any time, the Court of Appeals held that a District Court "acts within its jurisdiction when it modifies or vacates a protective order to allow [a public right of access to judicial documents], irrespective of whether it does so before or after a stipulation of dismissal has been filed." Id., 142. The Court of Appeals concluded that the District Court "acted within its jurisdiction when it issued the [u]nsealing [o]rder even though the order followed the parties' filing of the [s]tipulation of [d]ismissal."[57] Id.

We fully agree with the reasoning and conclusion of the Court of Appeals in *Gambale*.[58] As in *Gambale*, the trial court in the present case had inherent power to vacate or to modify the protective orders in the withdrawn cases—even though we may presume that, by operation of § 52-212a, the court otherwise had been divested of its authority to affect the substantive rights of the parties to those cases—as long as those protec-

[57] The court in *Gambale* also concluded, inter alia, that the District Court properly had unsealed the documents in its possession because the bank had failed to demonstrate a privacy interest in those documents that was sufficiently compelling to overcome the presumption of access to those documents. See *Gambale* v. *Deutsche Bank AG*, supra, 377 F.3d 142.

[58] We note that the Court of Appeals' opinion in *Gambale* was issued after the Appellate Court issued its opinion in the present case and, therefore, the Appellate Court did not have the benefit of it.

tive orders remained in effect. To conclude otherwise would require us to ignore both the court's inherent common-law authority to vacate or to modify its own equitable orders and the acknowledged public interest in documents filed with the court in connection with its adjudicatory function.

The Appellate Court rejected the newspapers' contention that the trial court had continuing jurisdiction on the ground that the protective orders were not injunctive in nature, explaining that "[i]njunctions and protective orders are substantively different because an injunction is a remedy . . . and a protective order is a case management tool." (Citation omitted.) *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, 77 Conn. App. 725. The Appellate Court further noted that the newspapers had cited "no Connecticut authority for the proposition that the protective . . . orders in the withdrawn cases were injunctions subject to the continuing jurisdiction of the court." Id., 726. We are not persuaded by the reasoning of the Appellate Court. Although a protective order is indeed a case management tool, it most frequently is used to remediate the unduly harsh or unfair consequences that otherwise might result from a party's obligation, arising under our rules of practice, to divulge information of a particularly private or sensitive nature. In that respect, a protective order shares the same equitable attributes as an injunctive remedy. More fundamentally, however, the Appellate Court has seized upon a distinction without a difference in characterizing an injunction as a remedy and a protective order as a case management tool. As we have explained, a protective order is an equitable device that operates in a manner virtually identical to an injunction. Indeed, in practical effect, a protective order fairly may be described as a type of injunction, albeit of limited scope.[59]

---

[59] We note, moreover, that the court's inherent authority to issue protective orders is embodied in Practice Book § 13-5, which provides: "Upon motion

Finally, unlike the Appellate Court, we are unwilling to draw any negative inference about the soundness of equating protective orders with injunctions—a proposition that we believe to be rather unremarkable—from the newspapers' failure to cite any Connecticut authority for it. Rather, we attribute that dearth of authority to the likelihood that the injunctive nature of protective orders previously has not been the subject of controversy, or even attention, in this state. In any event, we join other jurisdictions in expressly recognizing this essential nature of protective orders.[60] See, e.g.,

by a party from whom discovery is sought, and for good cause shown, the judicial authority may make any order which justice requires to protect a party from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (1) that the discovery not be had; (2) that the discovery may be had only on specified terms and conditions, including a designation of the time or place; (3) that the discovery may be had only by a method of discovery other than that selected by the party seeking discovery; (4) that certain matters not be inquired into, or that the scope of the discovery be limited to certain matters; (5) that discovery be conducted with no one present except persons designated by the judicial authority; (6) that a deposition after being sealed be opened only by order of the judicial authority; (7) that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way; (8) that the parties simultaneously file specified documents or information enclosed in sealed envelopes to be opened as directed by the judicial authority."

[60] We therefore disagree with the Appellate Court that "a theory of unending continuing jurisdiction in cases such as this would not be consistent with Practice Book § 7-10, which permits destruction of the files in a withdrawn action one year after the date of withdrawal . . . and with our long-standing policy of promoting judicial economy, the stability of former judgments and finality. . . . Continuing jurisdiction also could wreak havoc with the important public policy of encouraging pretrial resolution of disputes . . . where a party sometimes will buy his peace, though guilty of no wrongdoing, to end continuing litigation against him." (Citations omitted.) *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, 77 Conn. App. 730. Although it is true that the primary purpose of § 52-212a is to protect the finality of judgments; see *Kim* v. *Magnotta*, 249 Conn. 94, 102, 733 A.2d 809 (1999); § 52-212a expressly excepts certain cases from its four month limitation period, including cases, like the present one, that implicate the court's inherent power to vacate or to modify its injunctive orders. Furthermore, our rule of practice providing that files in withdrawn cases may be destroyed after one year protects against the very harm that the Appellate

*Gambale* v. *Deutsche Bank AG*, supra, 377 F.3d 141;
*Poliquin* v. *Garden Way, Inc.*, supra, 989 F.2d 535;
*Hallett* v. *Carnet Holding Corp.*, supra, 809 A.2d 1162.

## C

Having concluded that the trial court retained continuing jurisdiction over the withdrawn cases, we now must determine whether the court acted within its discretion in exercising its authority. For several reasons, we conclude that it did. First, the trial court's exercise of jurisdiction over the withdrawn cases was limited in scope; the court restored the withdrawn cases to the docket solely for the purpose of considering the Times' claim regarding sealed documents *in the court's files*. Indeed, the court expressly declined to assert its authority over documents that, although subject to the confidentiality provisions of the protective orders, were not in the court's possession. See footnote 14 of this opinion. Thus, the court's exercise of jurisdiction over the withdrawn cases did not implicate the substantive rights of the parties to those cases.

Second, as we have explained, the public has a real and legitimate interest in the workings of our courts, and vindication of that interest requires, as a general matter, that the courts' business not be conducted covertly. See, e.g., *Citizens First National Bank of Princeton* v. *Cincinnati Ins. Co.*, 178 F.3d 943, 945 (7th Cir. 1999) ("[T]he public at large pays for the courts and therefore has an interest in what goes on at all stages of a judicial proceeding. . . . That interest does not always trump the property and privacy interests of the litigants, but it can be overridden only if the latter interests predominate in the particular case . . . ."

Court identified. Finally, our determination that the present case falls within the continuing jurisdiction exception to § 52-212a does not deprive the Diocese or other interested parties of the opportunity to challenge the Times' claim on its merits.

[Citations omitted.]). Moreover, to the extent that the Times' motion to vacate the protective orders relates to judicial documents, the Times' interest in such documents is especially great, and the defendants[61] bear a heavy burden of establishing a compelling interest in preventing those documents from being disclosed to the public.[62] Furthermore, because the trial court has continuing jurisdiction over the withdrawn cases, by virtue of its inherent power to revisit its protective orders beyond the four month limitation period of § 52-212a, the fact that the Times did not seek relief in this case until approximately eight months after the expiration of that period does not militate against the court's exercise of discretion in favor of restoring the cases to the docket for the limited purpose requested.

Finally, "[i]n reviewing a claim of abuse of discretion, we have stated that [d]iscretion means a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice. . . . In general, abuse of discretion exists when a court could have chosen different alternatives but has decided the matter so arbitrarily as to vitiate logic, or has decided it based

[61] See footnote 7 of this opinion.

[62] The defendants possibly can establish that their willingness to settle the withdrawn cases was, to some degree, predicated on their belief that the documents at issue would remain sealed. A party's legitimate reliance on a sealing order is one factor, among others, that a court must consider in determining whether to modify a protective order, although that interest, standing alone, is not outcome determinative. See, e.g., *Pansy* v. *Stroudsburg*, 23 F.3d 772, 790 (3d Cir. 1994). In any event, that factor will be appropriate for the court to consider when it determines whether to modify the protective orders in the withdrawn cases. See, e.g., *Mokhiber* v. *Davis*, 537 A.2d 1100, 1105–1106 (D.C. App. 1988) ("assuming an intervenor does assert a legitimate, presumptive right to open the court record of a particular dispute, the potential burden or inequity to the parties should affect not the right to intervene but, rather, the court's evaluation of the merits of the applicant's motion to lift the protective order"); accord *Public Citizen* v. *Liggett Group, Inc.,* supra, 858 F.2d 787.

on improper or irrelevant factors." (Citation omitted; internal quotation marks omitted.) *State* v. *Peeler*, 271 Conn. 338, 416, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005). Because the trial court's decision to address the merits of the Times' motion—thereby effectively restoring the withdrawn cases to the docket—was a reasonable one, we reject the defendants' contention[63] that the court abused its discretion in doing so.

## V

We now turn to the fourth revised certified question, namely, the propriety of the trial court's action in effectively permitting the newspapers to intervene in the withdrawn cases. We conclude that the trial court's determination in that regard was proper.[64]

Because our rules of practice provide no specific articulation of the factors to be considered in determining whether intervention should be allowed, we have turned to rule 24 of the Federal Rules of Civil Procedure[65] for guidance. See *Horton* v. *Meskill*, 187 Conn.

[63] See footnote 37 of this opinion.

[64] We note, preliminarily, that intervention is the proper procedural device to be employed by a nonparty to an action for the purpose of challenging a protective order issued in that action. See, e.g., *San Jose Mercury News, Inc.* v. *United States District Court*, 187 F.3d 1096, 1100 (9th Cir. 1999); *Pansy* v. *Stroudsburg*, 23 F.3d 772, 778 (3d Cir. 1994); *United Nuclear Corp.* v. *Cranford Ins. Co.*, supra, 905 F.2d 1427; *Public Citizen* v. *Liggett Group, Inc.*, supra, 858 F.2d 783; *Davis* v. *Jennings*, 304 S.C. 502, 504, 405 S.E.2d 601 (1991); *Ballard* v. *Herzke*, supra, 924 S.W.2d 657. We also note that intervention may be a matter of right or it may be permissive. See, e.g., *In re Baby Girl B.*, 224 Conn. 263, 274–78, 618 A.2d 1 (1992); *Horton* v. *Meskill*, 187 Conn. 187, 191–92, 197, 445 A.2d 579 (1982); see also General Statutes §§ 52-107 and 52-108; Practice Book §§ 9-18 and 9-19. For purposes of this appeal, we treat the trial court's actions as the equivalent of granting the newspapers' request for permissive intervention. We therefore need not consider whether the newspapers were entitled to intervene as of right.

[65] Rule 24 of the Federal Rules of Civil Procedure provides in relevant part: "(a) Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of

187, 197, 445 A.2d 579 (1982). In reliance on that rule, "[o]ur cases establish that, in determining whether to grant a request for permissive intervention, a court should consider several factors: the timeliness of the intervention, the proposed intervenor's interest in the controversy, the adequacy of representation of such interests by other parties, the delay in the proceedings or other prejudice to the existing parties the intervention may cause, and the necessity for or value of the intervention in resolving the controversy." *In re Baby Girl B.*, 224 Conn. 263, 277, 618 A.2d 1 (1992); accord *Horton* v. *Meskill*, supra, 197. With respect to the propriety of the trial court's balancing of these factors, we have stated that "[a] ruling on a motion for permissive intervention would be erroneous only in the rare case [in which] such factors weigh so heavily against the ruling that it would amount to an abuse of the trial court's discretion." *Horton* v. *Meskill*, supra, 197. A party challenging a ruling on permissive intervention "bear[s] the heavy burden of demonstrating an abuse of . . . discretion . . . ." *In re Baby Girl B.*, supra, 297. The defendants have failed to meet that burden.

With respect to the timeliness of the newspapers' request to intervene, it is undisputed that the Times did not seek access to the sealed documents in the withdrawn cases until approximately one year after the withdrawal of those cases from the docket. Although

the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

"(b) Permissive Intervention. Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common. . . . In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties. . . ."

one year is not an insignificant period of time, we are not persuaded that it is so long as to bar the newspapers from intervening. Indeed, "[n]umerous courts have allowed third parties to intervene in cases . . . involving delays measured in years rather than weeks." *Public Citizen* v. *Liggett Group, Inc.*, supra, 858 F.2d 785; see *Equal Employment Opportunity Commission* v. *National Children's Center, Inc.*, 146 F.3d 1042, 1047 (D.C. Cir. 1998) (noting "growing consensus among [federal] courts of appeals that intervention to challenge confidentiality orders may take place long after a case has been terminated" [internal quotation marks omitted]); *San Jose Mercury News, Inc.* v. *United States District Court*, 187 F.3d 1096, 1101 (9th Cir. 1999) (noting that "delays measured in years have been tolerated [when a prospective] intervenor is pressing the public's right of access to judicial records"); *Pansy* v. *Stroudsburg*, 23 F.3d 772, 779 (3d Cir. 1994) ("a district court may properly consider a motion to intervene permissively for the limited purpose of modifying a protective order even after the underlying dispute between the parties has long been settled" [internal quotation marks omitted]); see also *Beckman Industries, Inc.* v. *International Ins. Co.*, 966 F.2d 470, 471, 476 (9th Cir. 1992) (trial court properly permitted intervention for purpose of seeking modification to protective orders approximately two years after underlying case had been settled and dismissed), cert. denied sub nom. *International Ins. Co.* v. *Bridgestone/Firestone, Inc.*, 506 U.S. 868, 113 S. Ct. 197, 121 L. Ed. 2d 140 (1992); *United Nuclear Corp.* v. *Cranford Ins. Co.*, supra, 905 F.2d 1427 (allowing intervention three years after settlement of case because intervention was solely for purpose of challenging protective order); *Mokhiber* v. *Davis*, 537 A.2d 1100, 1105 (D.C. App. 1988) (reversing denial of intervention when intervenor sought to challenge protective orders barring public access to court documents

despite four year delay between settlement of underlying action and motion to intervene, and even though intervenor became aware of action one year before seeking intervention). We, too, decline to place a rigid time limitation on intervention when, as in the present case, the sole purpose of the motion to intervene is to challenge a protective order. To conclude otherwise would be contrary to the important public interest that the motion seeks to vindicate. Moreover, although, in the present case, the four month limitation period of § 52-212a expired more than eight months before the date on which intervention first was sought, that limitation period did not operate as a bar to intervention because, for the reasons that we previously have explained, the court retained continuing jurisdiction over the protective orders issued in the withdrawn cases.

We already have adverted to the second relevant factor, namely, the newspapers' interest in the controversy. That consideration militates strongly in favor of intervention because the newspapers seek to vindicate the public interest in, and the presumptive right of access to, judicial proceedings and documents. Although the newspapers' interest in the withdrawn cases is limited in the sense that they do not have, and never have had, a stake in the outcome of those cases, they, and the public, do have a legitimate interest in the contents of the court's files.

Furthermore, that interest is not adequately represented by other parties to the litigation. Although it is true that the plaintiffs in the withdrawn cases opposed the defendants' efforts[66] to obtain the protective orders, there is nothing in the record to suggest that the plaintiffs in the withdrawn cases ever sought to vacate or to modify the protective orders, on grounds of changed

[66] See footnote 7 of this opinion.

circumstances or otherwise, once those orders were issued. The record is similarly devoid of any indication that the plaintiffs in the withdrawn cases are likely to take any future action to accomplish that end. Moreover, the interests of the plaintiffs in the withdrawn cases are distinct from those of the newspapers, which "seek to gain access on behalf of the general public in order to disseminate the information through the media." *Ballard* v. *Herzke*, supra, 924 S.W.2d 658.

With respect to any delay in the proceedings that the intervention might cause, no such delay will result because the cases that are the subject of the intervention motions have been settled and withdrawn. Thus, as the First Circuit Court of Appeals has explained: "This factor encompasses the basic fairness notion that intervention should not work a last minute disruption of painstaking work by the parties and the court. . . . For purposes of this factor, therefore, it is necessary to ask why a would-be intervenor seeks to participate, for if the desired intervention relates to an ancillary issue and will not disrupt the resolution of the underlying merits, untimely intervention is much less likely to prejudice the parties." (Citation omitted; internal quotation marks omitted.) *Public Citizen* v. *Liggett Group, Inc.*, supra, 858 F.2d 786; accord *Pansy* v. *Stroudsburg*, supra, 23 F.3d 779. In the present case, the newspapers' motions to intervene involve an ancillary issue concerning the protective orders, and the underlying cases have been withdrawn. Because the newspapers seek to litigate the issue of whether the protective orders should be vacated rather than an issue involving the merits of the withdrawn cases, we conclude that the delay in intervention caused little, if any, prejudice to the parties to the withdrawn cases.[67] See, e.g., *Pansy* v. *Stroudsburg*, supra, 779–80.

---

[67] We are not aware of any other possible prejudice that might inure to the defendants merely by permitting the newspapers to intervene for the purpose of adjudicating the merits of the Times' motion to vacate the protective orders.

We turn, finally, to the last factor, namely, the necessity for or value of the intervention in resolving the controversy. That factor bears no real relevance to the present matter because the cases in which the protective orders were issued have been withdrawn.

Upon consideration of the foregoing factors, we cannot conclude that the trial court abused its broad discretion in permitting the newspapers to intervene in the withdrawn cases. Neither the passage of time since the cases were withdrawn nor any other possible inconvenience to the defendants that might result from intervention outweighs the newspapers' strong interest in challenging the necessity of preserving the protective orders in those cases. Although the defendants will have a full and fair opportunity to defend against the merits of the Times' motion to vacate the protective orders, the defendants have not established that the trial court was required to deny the newspapers' motions to intervene for the purpose of litigating the merits of the motion to vacate.[68]

## VI

To summarize, we conclude, with respect to the trial court's actions at the April 24, 2002 hearing, that: (1) the trial court effectively restored the withdrawn cases to the docket; (2) restoration of the cases to the docket constituted an appealable final order; (3) the trial court had continuing jurisdiction over the withdrawn cases for the limited purpose of adjudicating the Times' motion to vacate the protective orders that had been issued in those cases; (4) the trial court did not abuse

---

[68] Because there is some question as to whether all of the individual defendants in the withdrawn cases received proper notice of the Times' motion to vacate the protective orders; see footnotes 13 and 21 of this opinion; we direct the trial court, on remand, to take appropriate measures to ensure that all parties to the withdrawn cases receive notice of that motion so that any and all such parties may participate in any subsequent · litigation regarding this matter.

its discretion in restoring the cases to the docket; and (5) the trial court effectively permitted the newspapers to intervene in the withdrawn cases and did not abuse its discretion in doing so. With respect to the trial court's memorandum of decision of May 8, 2002, we conclude that, because the trial court rendered that decision in violation of the automatic stay that had been triggered by the defendants' previously filed appeals, the orders issued in connection with that memorandum of decision must be vacated. Finally, it is necessary that the trial court, on remand, ensure that all parties to the withdrawn cases receive proper notice of this proceeding and any future proceedings in this matter.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to affirm the decisions of the trial court effectively restoring the withdrawn cases to the docket and granting intervenor status to the newspapers, to vacate the orders issued in connection with the trial court's May 8, 2002 memorandum of decision, and to remand the case to the trial court for a de novo determination, by a different judge, of the merits of the Times' motion to vacate the protective orders that were issued in the withdrawn cases.

In this opinion VERTEFEUILLE and LICARI, Js., concurred.

SULLIVAN, C. J., with whom ZARELLA, J., joins, dissenting. The majority concludes that the Appellate Court properly treated the trial court's actions as the effective equivalent of allowing the New York Times Company (Times), the Globe Newspaper Company, Inc., the Washington Post Company and the Hartford Courant Company (collectively, newspapers), to intervene in the withdrawn cases[1] and restoring the cases

---

[1] See footnote 3 of the majority opinion.

to the docket. I would conclude that the trial court's action is more properly characterized as the effective equivalent of docketing the newspapers' motions for the limited purpose of determining whether the court had jurisdiction to restore the cases to the docket. Accordingly, I believe that the cases should be remanded to the trial court for a determination as to whether the newspapers should be allowed to intervene and whether the cases should be restored to the docket. I also believe that, in making that determination, the court must consider whether the parties in the withdrawn matters relied on the permanence of the protective orders. If they did, the court should not grant the motions to intervene absent a showing of extraordinary circumstances or compelling need. Accordingly, I dissent.

At the April 24, 2002 hearing on the emergency motion to vacate the protective orders filed by the Times, counsel for the named defendant, the Bridgeport Roman Catholic Diocesan Corporation (Diocese),[2] argued that because "no motion was ever made to reopen or restore the case to the docket within four months, as required by [General Statutes] § 52-212a,"[3] the court lacked jurisdiction over the entire matter. The court responded that "[t]he case, clearly, wasn't reopened pursuant to that statute, so I don't see how I have personal jurisdiction, but the question is, that's not a subject matter jurisdiction statute." Counsel for the Diocese responded that, in the absence of consent of the parties, the court would have neither personal jurisdiction nor subject matter jurisdiction. Counsel for the Times argued that § 52-212a did not apply because the court had continuing

[2] For convenience, we refer to the defendants, collectively, as the Diocese.

[3] General Statutes § 52-212a provides in relevant part: "Unless otherwise provided by law and except in such cases in which the court has continuing jurisdiction, a civil judgment or decree rendered in the Superior Court may not be opened or set aside unless a motion to open or set aside is filed within four months following the date on which it was rendered or passed. . . ."

jurisdiction over the protective orders in that they were injunctive in nature.

The court then asked counsel for the Times whether it could order the parties in the withdrawn matters to file materials in their possession with the court without having personal jurisdiction over the parties. Counsel for the Times argued that the court had ongoing jurisdiction to modify the order prohibiting the dissemination of those materials, but conceded that federal case law indicated otherwise. Counsel for the Diocese stated that the question of the court's jurisdiction to order the parties to file materials with the court was "another jurisdictional issue," and argued that the court had no such jurisdiction. He further argued that the Diocese had not had an opportunity to brief the question of whether the cases could be restored to the docket and that the Times had raised the continuing jurisdiction argument for the first time at the hearing. Counsel for the Times responded that "if the court would find, after this hearing, further briefing is helpful, I would be more than happy to do that. If the suggestion is, let's go home now until jurisdiction is resolved, then I would just say that that's probably not the most efficient way to proceed, no harm, no foul, that we proceed to argue the merits and the court makes whatever decision it ultimately makes on the jurisdiction."

The court stated that "my impression is this is a matter of legitimate public interest that should be handled expeditiously, so that's why I've expedited this process." The court then ruled that it had jurisdiction "with respect to what is in the clerk's office in sealed envelopes. I think, I do not have jurisdiction to order the parties to file anything, so I really don't feel that there's jurisdiction to enter that type of order." The court then reiterated that "my determination is that I do have jurisdiction, at least with respect to what's been sealed in the files." The court indicated that it

would hear the merits of the newspapers' claims immediately, but also indicated that its ruling that it had jurisdiction to hear the merits was "subject to being revisited" and that the parties should submit briefs on the issue.

The Diocese never filed briefs on the issue of the court's jurisdiction to restore the cases to the docket. Instead, on May 3, 2002, the Diocese filed three appeals to the Appellate Court from "the trial court's [April 24, 2002] order restoring cases to docket, after passage of more than four months since withdrawal, and creating new case file."

On May 8, 2002, the trial court issued its memorandum of decision on the merits of the emergency motion to vacate sealing orders. The court indicated that it viewed the appeals to the Appellate Court as inappropriate because it had "specifically indicated [at the April 24 hearing] that it did not have jurisdiction over the parties and *the court did not enter any rulings in the [twenty-three] cases*."[4] (Emphasis added.) The court also stated it had rendered no judgment in the new "file" created by the court for the purpose of addressing the newspapers' application and that it viewed the filing of the appeals and the Diocese's failure to file a brief on the jurisdictional issue "as indicative of the Diocese's express waiver of the right to be heard further on the merits of the Times' application." The court then addressed the merits of the newspapers' claims. It deter-

---

[4] The majority states that "there is no principled way" to separate the court's ruling on the protective orders from the court's ruling on the documents. I disagree. As the trial court recognized, it is clear that the court must have jurisdiction over documents in its possession in the sense that the court ultimately must make the decision as to how and when to dispose of the documents. As I discuss more fully in the body of the opinion, however, if the court does not have personal jurisdiction over the parties to the withdrawn cases or determines that modifying orders entered in those cases will upset the settled expectations of the parties, I do not believe that the court has jurisdiction over those orders.

mined that the protective orders had expired at the time of settlement and granted the newspapers access to the records in all twenty-three of the withdrawn cases.

On May 10, 2002, the Appellate Court ordered the parties to appear and give reason why the appeals should not be dismissed for lack of an appealable final judgment. The court also ordered a stay of all proceedings, including the trial court's May 8, 2002 order releasing the records. The Appellate Court supplemented this order on May 13, 2002, with an order directing the parties to address in their briefs on the final judgment question whether the appeals properly had been taken from the April 24, 2002 hearing or whether they should have been taken from the May 8, 2002 decision. After the hearing on these issues, the Appellate Court, on June 5, 2002, ordered that its May 10 and May 13, 2002 orders be marked "off," apparently because it had determined that the trial court had not acted on the pending motions to intervene or articulated the basis for its authority to open a new file at the request of a nonparty more than 120 days after the withdrawal of the actions. Accordingly, the Appellate Court ordered the trial court to act on the motions to intervene and to articulate the basis for its authority to open a new file.

On June 7, 2002, the trial court granted all pending motions to intervene in the case captioned *Application of New York Times* v. *Sealed Records*, Superior Court, judicial district of Waterbury, Docket No. X06-CV-02-0170932-S, and denied all pending motions to intervene in the withdrawn cases. On June 13, 2002, the court issued its articulation in which it stated that it was unable to act on the motions to intervene in the withdrawn cases—which never had been docketed—because the cases had not been reopened. It further stated that it had opened a "new file" on the basis of its inherent powers to address complaints, applications

and petitions that are presented to it. The court also relied on this court's decision in *AvalonBay Communities, Inc.* v. *Plan & Zoning Commission,* 260 Conn. 232, 246, 796 A.2d 1164 (2002), as supporting its authority to enter postjudgment orders after the expiration of the four month period prescribed by § 52-212a.

On the basis of this history, the majority concludes that the *only possible* interpretation of the court's actions at the April 24, 2002 hearing is that the court effectively restored the cases to the docket. I disagree. Although the trial court ruled unequivocally at the April 24, 2002 hearing that it had jurisdiction over the sealed documents, its ruling that it had jurisdiction to hear arguments on the merits of the Times' claim without restoring the cases to the docket pursuant to § 52-212a clearly was *provisional.* If the issue had been briefed as requested by the court, the court might have been persuaded that it could not take any action that would affect the withdrawn cases without restoring the cases to the docket and that it had no authority to do so. The trial court's May 8, 2002 decision also should not be treated as the effective equivalent of restoring the cases to the docket because, as the majority recognizes, the trial court lacked jurisdiction to issue any ruling at that point in light of the pending appeals. Accordingly, I would conclude that the court made no determination that can be treated as the functional equivalent of restoring the cases to the docket and, therefore, that there was no appealable final judgment.[5] For the same reasons, I

---

[5] The case relied on by the majority, *CFM of Connecticut, Inc.* v. *Chowdhury,* 239 Conn. 375, 685 A.2d 1108 (1996), is distinguishable because, in that case, we determined that "[t]he conclusion is inescapable that, had a formal motion to restore to the docket been presented to [the trial court, it] would have granted it." Id., 392. Nothing in the record before us in the present case leads to any such inescapable conclusion. Indeed, the trial court specifically denied that it had reopened the cases and took no action that would have required the cases to have been reopened until it issued its May 8, 2002 ruling granting the newspapers access to the sealed records, at which time it lacked jurisdiction to take any such action.

would also conclude that the trial court's actions cannot be treated as the effective equivalent of permitting the newspapers to intervene.[6]

In any event, even if it is assumed that the court effectively restored the cases to the docket, I would reverse that ruling because the trial court never applied the proper standard. I believe that the trial court was required to consider whether the parties in the withdrawn cases had settled the cases in reliance on the permanence of the protective orders.[7] If so, the court

---

[6] I agree with the majority's conclusion that, under federal law, intervention appears to be a proper procedural device for a nonparty to seek to modify a protective order, even after the action in which the order was entered has terminated. I see no differences between federal law and Connecticut law to suggest that such a procedure may not be employed here. I am concerned, however, that this procedure occasionally may give rise to practical difficulties. When, as in the present case, there are numerous parties to the underlying action and the motion to intervene is brought long after the termination of the case, it may prove impossible to locate and give notice of the motion to some of the parties. It also is not clear what the procedure for giving notice of the motion to intervene should be or how the court can be expected to give notice of hearings and rulings to parties who are no longer represented by the attorneys who appeared for them in the terminated action. I believe that the inability to give proper notice to all parties should weigh heavily against granting the motion to intervene.

I also note that, in the present case, it is a mere fortuity that the parties had not retrieved and the court had not destroyed the documents before the newspapers sought to intervene. In my view, that fact should weigh against allowing intervention. If it is acceptable as a policy matter for parties to retrieve documents from the court and for the court to destroy documents at a certain point, then the same policy interests—presumably those favoring stability and finality in the disposition of cases—should militate against restoring the matter to the docket. The mere accident that the documents are still in the court's custody in the present case is not a reason for treating the case differently from a case in which the parties and the court diligently fulfilled their obligations with respect to the documents.

[7] The Diocese represents in its brief that "[i]n settling these actions, the Diocese relied upon the existence of the [protective] orders and the confidentiality that they ensured. . . . The Diocese also relied upon the expectation that the materials filed under seal would continue to be treated as such. . . . In deciding to settle, an essential factor was the expectation and belief by the Diocese that the sealed materials in the court files would remain sealed, and that the discovery documents were and would remain confidential."

should not have granted the motions to intervene absent a showing of some extraordinary circumstance or compelling need. The general rule is that intervention after an action has been terminated is highly disfavored and will be granted only in extraordinary cases.[8] Several courts have recognized an exception to this rule when intervention is sought for the purpose of modifying a protective order entered in the terminated action. See, e.g., *Pansy* v. *Stroudsburg*, 23 F.3d 772, 778–79 (3d Cir. 1994) (court does not follow rule prohibiting intervention in terminated action where intervention is sought for purpose of modifying protective order). The rationale for this exception is that, because "the desired intervention relates to an ancillary issue and will not disrupt the resolution of the underlying merits, untimely intervention is much less likely to prejudice the parties." (Internal quotation marks omitted.) Id., 779, quoting

---

[8] See *United States* v. *Associated Milk Producers, Inc.*, 534 F.2d 113, 116 (8th Cir.) ("[t]he general rule is that motions for intervention made *after* entry of final judgment will be granted only upon a strong showing of entitlement and of justification for failure to request intervention sooner" [emphasis in original]), cert. denied sub nom. *National Farmers' Organization, Inc.* v. *United States*, 429 U.S. 940, 97 S. Ct. 355, 50 L. Ed. 2d 309 (1976); *Crown Financial Corp.* v. *Winthrop Lawrence Corp.*, 531 F.2d 76, 77 (2d Cir. 1976) (intervention after judgment is unusual and not often granted); *Black* v. *Central Motor Lines, Inc.*, 500 F.2d 407, 408 (4th Cir. 1974) ("[i]ntervention is ancillary and subordinate to a main cause and whenever an action is terminated, for whatever reason, there no longer remains an action in which there can be intervention"); *Abdul-Raheem* v. *Orr*, 672 F. Sup. 1389, 1391 (W.D. Okla. 1986) (when action is terminated, for whatever reason, there no longer remains action in which to intervene); *Mundt* v. *Northwest Explorations, Inc.*, 947 P.2d 827, 830 (Alaska 1997) (motions to intervene made after conclusion of litigation normally are not timely absent showing of justification); *In re One Cessna 206 Aircraft*, 118 Ariz. 399, 402, 577 P.2d 250 (1978), quoting *United States* v. *Associated Milk Producers, Inc.*, supra, 116; *State Employees' Credit Union, Inc.* v. *Gentry*, 75 N.C. App. 260, 264, 330 S.E.2d 645 (1985) (motions to intervene made after judgment has been rendered are disfavored and are granted only after finding of extraordinary and unusual circumstances or upon strong showing of entitlement and justification); *Marteg Corp.* v. *Zoning Board of Review*, 425 A.2d 1240, 1243 (R.I. 1981) (because of potential of prejudice to parties, person seeking to intervene after judgment has especially heavy burden).

*Public Citizen* v. *Liggett Group, Inc.*, 858 F.2d 775, 786 (1st Cir. 1988), cert. denied, 488 U.S. 1030, 109 S. Ct. 838, 102 L. Ed. 2d 970 (1989); see also *Equal Employment Opportunity Commission* v. *National Children's Center, Inc.*, 146 F.3d 1042, 1047 (D.C. Cir. 1998) ("timeliness requirement is to prevent prejudice in the adjudication of the rights of the existing parties, a concern not present when the existing parties have settled their dispute and intervention is for a collateral purpose" [internal quotation marks omitted]); *Mokhiber* v. *Davis*, 537 A.2d 1100, 1105 (D.C. App. 1988) ("access to court records does not involve relitigation of the underlying dispute, so the rationale behind requiring extraordinary circumstances for postjudgment intervention does not as a rule apply to access claims").

Because the sole rationale for allowing intervention in a terminated action, when intervention is sought for the purpose of modifying a protective order, is that such intervention will not affect the settled expectations of the parties,[9] I believe that the court must determine

[9] My research has revealed no cases in which the court has found an exception to the rule prohibiting intervention in a closed case merely because the remedy granted in the case was injunctive in nature. Cf. *Garrity* v. *Gallen*, 697 F.2d 452, 455–56 (1st Cir. 1983) (denying postjudgment motion to intervene in case in which court granted injunctive relief as, inter alia, untimely); *Vonage Holdings Corp.* v. *Minnesota Public Utilities Commission*, United States District Court, Docket No. 03-5287 (D. Minn. January 14, 2004) (same). Thus, I believe that the majority's reliance on the rule enunciated in *AvalonBay Communities, Inc.* v. *Plan & Zoning Commission*, supra, 260 Conn. 246, that courts always have jurisdiction to effectuate their judgments, and the corollary rule that courts always have jurisdiction to modify injunctions, is misplaced. The rationale for allowing postjudgment intervention for the purpose of modifying a protective order is not that doing so will vindicate the judgment, but that doing so will *not affect* the rights of the parties as bargained for or adjudicated before the case was terminated. Conversely, when granting the intervention will undermine the settlement or judgment, it must be denied except in an extraordinary case. Accordingly, I believe that the principle underlying *AvalonBay Communities, Inc.*, that the integrity of judgments should be protected, acts to *limit* the court's power to grant postjudgment intervention for the purpose of modifying a protective order.

whether the parties relied on the permanence of the protective orders in settling the cases *before* allowing intervention. If the court determines that reliance on the permanence of the protective orders was an integral part of the settlement or disposition of the case, I believe that the court should not grant the motions to intervene absent a showing of an extraordinary circumstance or compelling need. Cf. *Securities & Exchange Commission* v. *TheStreet.com*, 273 F.3d 222, 229 (2d Cir. 2001) (when parties have relied on protective order, court should not modify order "absent a showing of improvidence in the grant of [the] order or some extraordinary circumstance or compelling need" [internal quotation marks omitted]), quoting *Martindell* v. *International Telephone & Telegraph Corp.*, 594 F.2d 291, 296 (2d Cir. 1979);[10] see also *In re Agent Orange Product Liability Litigation*, 821 F.2d 139, 147 (2d Cir.) (when parties have relied on permanence of protective order, "it can only be modified if an extraordinary circumstance or compelling need warrants the requested modification" [internal quotation marks omitted]), cert. denied sub nom. *Dow Chemical Co.* v. *Ryan*, 484 U.S. 953, 108 S. Ct. 344, 98 L. Ed. 2d 370 (1987); *Federal Deposit Ins. Co.* v. *Ernst & Ernst*, 677 F.2d 230, 232 (2d Cir. 1982) (same).[11] Accordingly, I would remand the case to the

---

[10] In *Securities & Exchange Commission* v. *TheStreet.com*, supra, 273 F.3d 224–25, the intervening plaintiff sought to intervene prior to judgment for the purpose of modifying a protective order. The District Court granted the motion to intervene and unsealed certain documents. Id., 227. On appeal to the United States Court of Appeals for the Second Circuit, the defendant did not challenge the intervention, but only the modification of the protective order. Id., 228. The court noted that modification should not be granted absent compelling need or extraordinary circumstances when the protective order has been relied upon. Id., 229. In my view, when intervention is sought *after* judgment, the principle cited by the Second Circuit Court of Appeals should bar not only modification, but also intervention.

[11] In *Mokhiber* v. *Davis*, supra, 537 A.2d 1105–1106, the court concluded that, when secrecy is integral to settlement, the potential for inequity should affect the court's evaluation of the merits of the motion to modify a protective order, not the right to intervene. As I have indicated, however, the rationale for allowing intervention after judgment in such cases is that it is not

Appellate Court with instruction to remand the case to the trial court to determine whether the cases should be restored to the docket. I believe that the court, in making that determination, should consider whether the parties relied on the permanence of the protective orders in reaching settlement and, if so, whether there are extraordinary circumstances or compelling needs warranting intervention.

inequitable to do so when it would not affect the litigated rights of the parties. Therefore, I believe that this is a threshold issue that must be resolved *before* the court considers the merits of the motion for modification.